'CASE 37—ACTION TO ANNUL CORPORATE ACTION.—Nov. 1.

# Huffaker, Etc. v. Krieger's Assignee.

APPEAL FROM LAW AND EQUITY DIVISION OF JEFFERSON CIRCUIT COURT.

CORPORATIONS—DIRECTORS—COMPENSATION.—While, as a general rule, directors of a corporation are not entitled to compensation for services rendered by them in the line of their duty, where there is neither express contract nor a provision to that effect in the charter, where extraordinary services have been rendered and those services have been recognized by the stockholders in corporate meeting and compensation has been voted to them, the minority will not be permitted to appeal to the courts to annul such action.

PIRTLE AND TRABUE FOR APPELLANTS.

(Brief withdrawn.)

HELM & BRUCE FOR APPELLEE.

1. Directors are not entitled to compensation unless it is contracted for prior to the rendition of the services.

2. The services rendered in this case were directorial in their character, and were rendered without any contract for payment.

3. Even if the services were not directorial, they were rendered under circumstances which do not raise an implied promise to pay for them.

Citations: Loan Assn. v. Stonemetz, 29 Pa. St., 534; Kilpatrick v. Ferry Bridge Co., 49 Pa. St., 118; Martindale v. Wilson-Cass Co. (Pa.) 19 Atl. Rep., 680; 1 Morawetz on Private Corporations, (2d ed.), sec. 508; Carr v. Coal Company, 25 Pa. St., 337; Butts v. Wood, 38 Barb., 181; Coleman v. 2d. Ave. R. R. Co., 38 N. Y., 201; Mather v. Eureka Mower Co. (N. Y.) 23 N. E. R., 993; Smith v. Putnam, 61 N. H., 632; Gill v. Cab Co., 1 N. Y., 202; Barril v. Water Proofing Co., 2 N. Y. Sup., 758; N. Y. & N. H. R. Co. v.

Ketchum, 27 Conn., 170; Dustan v. Imperial Gas Co., 3 B.
and Ad., 125; Ferry Road Co..v. Branegan, 40 Ind., 261; Cheeney
v. L. B. & M. R. W. Co. 68 Ill., 570; Gridley v. L. B. & M. R.
Co,, 71 Ill., 201; Ills. Linen Co. v. Hough, 91 Ill., 63; Citizens
Nat. Bank v. Elliott, 55 Iowa, 104; Franklin Ins. Co. v. Hart,
39 Md., 59; Low v. C. B. R. R. Co., 46 N. H., 284; Hall v.
Railroad Co., 28 Vt., 406; Insurance Co. v. Crane, 6 Met. (Mass.)
64; Holland v. Bank, 52 Maine, 564; McAvity v. Paper Co..
(Maine) 20 Atl. Rep., 82; Ekin v. Smer. White Bronze Co.,
(Mich.), 42 N. W. R., 982.

JUDGE HOBSON DELIVERED THE OPINION OF THE COURT.

The East End Improvement Company was a corporation
organized for the purpose of building a bridge over the
Ohio river at Louisville known as the "Louisville and
Jeffersonville Bridge." The total capital stock, par value
was $744,000. Of this Dennis Long owned $176,500, and
Jacob Krieger $103,000. The company needed much more
money than it had. Dennis Long became liable by in-
dorsement for $490,565.99, and loaned or paid debts for
the company to the extent of $388,429.91. Jacob Krieger
indorsed for it to the amount of $352,023.50, and paid
debts for it amounting to $88,090.35. When affairs were
in this condition, Krieger made an assignment. The bridge
was not completed, and the company was without means
to complete it. An assignment was contemplated, but
finally, in August, 1892, a committee was appointed, con-
sisting of Samuel A. Miller, George J. Long (the son-in-
law and son of Dennis Long), T. W. Spindle (the presi-
dent of the trust company to whom Krieger had assigned),
and J. H. Huffaker, with instructions to visit New York,
and make a contract with C. P. Huntington for the com-
pletion of the bridge. And it was expressly agreed that,
if successful, the corporation would pay them for their
services by issuing to them a large amount of the treas-
ury stock of the company, of value over $100,000. This

committee, after visiting New York several times, failed to make a contract with Mr. Huntington which they could carry out, and on September 7th they so reported, and were discharged. Neither the board of directors nor the stockholders took any further express action, but Dennis Long, George J. Long, Samuel A. Miller and Joseph Huffaker, all being members of the directory, continued to make negotiations looking to the sale of the bridge to some railroad company, and on April 6, 1893, they reported to the stockholders that, after many unsuccessful attempts and discouraging failures, they had finally, on the 31st of March, closed a contract with three railroad systems, which agreed to issue bonds on the bridge and terminals in the aggregate $5,000,000, secured by mortgage thereon, and furnish the money necessary to complete the bridge, and pay for right of way for the bridge and approaches, the latter not to exceed $525,000, which they had guarantied it should not do. By the agreement the East End Improvement Company was to receive $1,800,000 of the bonds, par value, and convey to the Louisville & Jeffersonville Bridge Company all the real estate owned by it, and deliver to the contracting railroads all the securities belonging to the Louisville & Jeffersonville Bridge Company, consisting of the entire issue of $1,000,000 of first mortgage bonds and the entire issue of $1,500,000 of stock. It was also stipulated that all this property should be entirely free from debt or other incumbrance excepting the $1,000,000 of first mortgage bonds. At the time the contract was made, a lien claim existed against the East End Improvement Company in favor of the Phoenix Bridge Company for about $250,000, and, as shown by their report to the stockholders, Miller and his associates, after making the contract with the railroads, had set to work to settle this

debt. They finally closed it up for $187,847.35. To effect
this settlement, it was necessary to raise $100,000, which
they had borrowed upon their personal indorsement. The
balance of the claims, amounting to about $90,000, they
had settled by notes for four months, indorsed by them
personally; by all of which they got back for the corpora-
tion $85,000 of stock held by one of the creditors, besides
the reduction of something over $60,000 in the debts. They
also reported that the $1,800,000 of bonds, secured as they
were, would be worth par, or nearly so; that, after paying
all the debts and liabilities of the company, there would
be enough left from the sale of the bonds to pay a con-
siderable dividend to the stockholders; that they had paid
their own expenses, and done a great deal of work and
traveling to effect this arrangement, and had been at a
very large expense of both time and money, relying upon
the corporation's paying them in case they were success-
ful; that no contract was made for the payment of their
services in advance, because, being members of the direc-
tory, they did not think it proper to contract with it, and
it was not considered prudent to call a meeting of the
stockholders, as this would have been dangerous to the
interest of the company in the midst of the delicate ne-
gotiations then in progress; that, in view of the proposi-
tion the company had previously made, they felt assured,
if they went ahead, the company would pay them for their
services when the results were laid before the stock-
holders; that the other members of the board were con-
stantly consulted by the committee, and, while there was
no express agreement for pay, the services were rendered
in the expectation that in a proper way, and at a proper
time, the stockholders would pay for them; that the ser-
vices were unusual; and beyond the line of the duty of di-

rectors, and, had there been a majority of the board not
interested, a contract to pay for them could have been
legally made; that the company was without means to
employ agents, and could not have paid the traveling ex-
penses even of the committee; that in the aggregate they
had given months of their entire time to the business,
spending in New York and other cities weeks consecu-
tively; that the Phoenix Bridge Company had attached
the property of the company to secure their claim of
$250,000, and even the lawyers of the company had sued
out attachments on claims aggregating over $31,000, and,
but for the unprecedented services of the committee, and
their furnishing their own means and personal credit, all
the property of the company would have been sold out
under the hammer. Believing that they had a legal claim,
and one that, under the circumstances, was just and right,
the committee asked $100,000 of the bonds as compensation
for the services they had rendered and such as they would
be required to render in closing up the contract which
they had made, there being yet much to be done to con-
summate the arrangement.

Thereupon the stockholders adopted a resolution
declaring it to be the sense of the meeting that
the committee were entitled to pay for the services
rendered by them to the corporation in disposing
of the interest of the company in the bridge, settling the
claim of the Phoenix Bridge Company, and other ser-
vices mentioned in the report; and, inasmuch as the board
of directors, of which they were members, could not make
an appropriation in payment of their services without
authority from the stockholders, the directors were author-
ized to deliver to them one hundred of the bonds in pay-
ment of their services when the bonds were received by

the officers of the company. All the stockholders voted for this resolution who were present or represented in the meeting, except the estate of Jacob Krieger. The stockholders who were not represented in the meeting afterwards ratified and confirmed it; so that the only dissenting stockholder is the estate of Krieger, the assignee deeming it a mere gratuity to the four gentlemen named, and refusing, for that reason, to vote for it. The corporation being about to deliver the bonds, the assignee of Krieger filed this suit to test the right of the committee to the compensation allowed them, insisting that, being directors, they had no legal claim against the corporation for the services rendered by them, and that the action of the stockholders in voting them the $100,000 in bonds was only a donation. The court below sustained a demurrer to their answer, and entered judgment in bar of their right to the bonds. From this judgment they have appealed.

Directors are not entitled to compensation for their services in discharge of their official duties unless compensation is provided for by the charter or by-laws, nor are they entitled to payment on a *quantum meruit* for the performance of services previously rendered by them within the line of their duty as directors. (Note to Ten Eyck v. Pontiac, &c., Railroad Co. (Mich.), 3 Law. Rep. Ann., 378; s. c. [41 N. W., 905].) But this rule does not apply where the services rendered are not within the scope of the directors' duty, and the circumstances are such as to imply that both parties understood they were to be paid for.

"A bank or other corporation may be bound by an implied contract in the same manner as an individual may. But in any case the mere fact that valuable services are rendered for the benefit of a party does

not make him liable upon an implied promise to
pay for them. It often happens that persons ren-
der services for others which all parties under-
stand to be gratuitous. Thus directors of banks and many
other corporations usually receive no compensation. In
such cases, however valuable the services may be, the
law does not raise an implied contract to pay by the party
who receives the benefit of them. To render such party
liable as a debtor under an implied promise, it must be
shown, not only that the services were valuable, but also
that they were rendered under such circumstances as to
raise the fair presumption that the parties intended and
understood that they were to be paid for; or, at least, the
circumstances were such that a reasonable man in the
same situation with the person who receives and is bene-
fited by them would and ought to understand that com-
pensation was to be paid for them." (Pew v. First Na-
tional Bank, 130 Mass., 391.)

In Fitzgerald, &c., Construction Co. v. Fitzgerald, 137 U.
S., 98, [11 Sup. Ct., 36], the United States Supreme Court,
by Chief Justice Fuller, after quoting the above with ap-
proval in a case of this sort, adds:

"Tested by this rule, we think that the court fairly left
it to the jury to determine whether Fitzgerald rendered
services of such a character, and under such circumstances,
that he was entitled to claim compensation therefor."

In Santa Clara Mining Association v. Meredith,
49 Md., 389, [33 Am. R., 264], the question for
determination was whether a director of a corporation
could recover for services rendered it without an express
contract of employment. In affirming a judgment for
the plaintiff, the court said:

"To entitle a president or director of a cor-

poration to recover for services rendered his cor-
poration, he must prove an express contract of
employment, if the services for which he claims compen-
sation are within the line and scope of his duty as pres-
ident or director; . . . but if a president or director
of a corporation renders services to his corporation
which are not within the scope of, and are not
required of him by, his duties as president or di-
rector, but are such as are properly to be performed by
an agent, broker, or attorney, he may recover compensa-
tion for such services upon an implied promise [citing
authorities]. Agency for a corporation is not required
to be shown by a resolution of the board of directors, or
other written evidence, but it may be inferred from facts
and circumstances."

In Deane v. Hodge, 35 Minn., 146, [59 Am. R.,
321; 27 N. W., 917], a director of a corpora-
tion was held entitled to recover against it for the use
of a patent owned by him without any agreement in words
that it was to be paid for. Among other things, the court
said:

"A man has a right to render a voluntary service
or give a right to use his property to another without re-
muneration, and, if he does, he can not afterwards re-
cover for such services, or use of his property, but it does
not follow that his mere neglect to demand a specific agree-
ment for compensation, or to forbid the use of his property,
necessarily deprives him of his right to a reasonable re-
muneration. . . . Where the evidence fails to disclose
an express agreement or understanding, the law may imply
a contract from the circumstances or the acts of the par-
ties; and, where there is nothing from which a contrary
intention or understanding is to be inferred, it is a just

and reasonable presumption that he who has received the benefit of the services or property of another impliedly undertakes to make compensation therefor. Implied contracts are such as reason and justice dictate, and which, therefore, the law presumes that every man has contracted to perform."

These principles seem to us to control this case. As directors of the East End Improvement Company, it was the duty of appellees to build the bridge, and carry on the business of the corporation incidental thereto, with the means placed at their disposal by the stockholders. It was not incumbent on them, as directors, to expend their personal means for the corporation, or to travel to distant cities, and remain there for months, in efforts to sell the plant of the company. When they entered upon negotiations for the sale of the plant, the corporation having authorized a previous committee to make a sale, and agreed to compensate them for their services, it was not unreasonable in appellees to expect pay for their services in the same matter, which they took up just where the other committee left it off; and as it involved large personal outlays of money and time, as well as the assumption of staggering financial obligations, no one could reasonably have expected the services to be gratuitous. The stockholders knew they were on the verge of bankruptcy, and they could not fail to know, when the other committee was discharged, that something had to be done in this direction.

That no express contract was made beforehand is explained by the fact that the appellees, being members of the directory, could not contract with themselves; and from the peculiar condition of the company, and the nature of the negotiations, it was not prudent then to call

the stockholders together. When the stockholders were
called together, they had not finished their work. The
compensation voted to them covered past as well as fu-
ture services; and the stockholders, who then knew best
the circumstances, and whether or not, in justice and right,
the claim should be paid, having voted for its payment,
the court will not, in the absence of fraud or clear mis-
take, substitute its judgment for theirs. The settlement
of an existing claim is always a good consideration for
a contract. This was such a contract as the body of the
stockholders clearly had the authority to make, and, there
being a quorum of the stockholders outside of the stock
held by appellees, and a majority of this quorum having
voted for it, the presumption is in favor of their decision.
In fact, all the stockholders, substantially, except Krie-
ger's estate, in one form or another, voted for or ratified
the settlement. The appellants had saved the corporation
from bankruptcy. By reason of the arrangements they
had made all its debts were paid, including those on which
Krieger's estate was bound, besides the amount due to
it for money he had advanced to the company; and, in
addition to this, the stockholders received a dividend of
about 33 per cent. on their stock. In view of these facts,
it seems to us that the stockholders might well have taken
the action they did, under the golden rule, not for the pur-
pose of conferring a donation, but for the purpose of doing
what, as honest men, they had a right to think just and
right under the circumstances. It was a question they
had to decide, and, they having decided it,—presumably
according to what they thought just and right,—their
judgment, if fairly exercised, must control.

We have examined the numerous cases to which we have
been referred by the learned counsel for appellee. It

[14]

would unduly extend this opinion to notice them all, but such as are especially relied on will be briefly considered.

Loan Association v. Stonemetz, 29 Pa. St., 534, is the leading case. There Stonemetz was the director of a loan association, and served as chairman of the committee on short loans. There was no contract to pay him for his services, and the stockholders refused to pay him. He then sued for his services, and it was held that he could not recover, because all that he did was strictly within the line of his duty as director, and there was neither a moral nor a legal obligation on the company.

Another leading case relied on is New York, Etc., Railroad Co. v. Ketchum, 27 Conn., 170. In that case Ketchum claimed a pass over the road for certain services rendered by him when he was director. The stockholders declined to recognize his right to the pass, and directed it to be cancelled. He then filed suit, and it was held that a part of his services were rendered by him as a promoter before the company was organized, and created no obligation upon the company, and that the rest of his services fell within his duty as director.

Another case specially relied on is Cheeney v. The Lafayette, &c., Railroad Co., 68 Ill., 570; [18 Am. R., 584]. In that case Cheeney was a director and a member of the executive committee, and as such rendered services for which he presented a claim amounting to $4,000. The executive committee, on January 13, 1872, audited the claim. The board of directors, on January 31, 1872, appropriated $25,000 to pay it and other claims, but nothing was paid him. He then filed suit, and the company resisted a recovery. It was held that part of his services were within the scope of his

duty as director, and that part were not; that as to the former he could not recover, but as to the latter he could. The law is stated by the court as in the cases we have quoted, but it is applied a little more strictly in determining what was in the line of his duty as director than in most of the other cases. Still there was no action of the stockholders in that case settling the matter before suit, and exercising the undoubted right they had of making peace quickly, and so keeping out of court, avoiding the bad effect a litigation might have had on the interest of the corporation. That was not near so strong a case as this for a recovery *ex equo et bono*. There was no reason shown, as here, why a contract had not been made beforehand. The corporation objected. There had been no promise to pay a preceding committee. The services were rendered in carrying on the business of a going concern, and were all performed.

The other cases relied on for appellee are like these three. None of them come up to this case.

"As a general rule, a contract between a corporation and its directors is not absolutely void, but voidable at the election of the corporation. Such a contract does not necessarily require an independent and subsequent act of ratification, but it may become finally established as a valid contract by acquiescence. The right to avoid it may be waived." Kelly v. Newberry, Port, &c., Railroad Co., 141 Mass., 499, [6 N. E., 748].

When appellants reported to the stockholders what they had done, and asked the corporation to accept the contract they had made, and pay them for their services, the stockholders, in accepting the benefit of the contract, and thereby securing appellants' services in completing

what they had begun, took the benefit with the burden. After they thus acquiesced in the action of the directors, the voidable contract arising by implication of law from the action of the directory, who knew all the facts, became finally established, and binding on the corporation. It is a striking fact that, not only did no other stockholder complain, but even the assignee of Krieger put his objection on the ground that he must discharge a legal duty. The corporation does not object. All the bonds have been delivered but the sixteen supposed to cover the interests of Krieger's estate. Unanimity in corporate matters is not required. The act of the majority within the scope of their authority is the act of the corporation.

For these reasons we are of the opinion that the court erred in sustaining the demurrer to the answer of appellants, and that, on the facts shown, the petition should be dismissed.

Judgment reversed, and cause remanded for further proceedings not inconsistent with this opinion.