## FRUIT GROWERS' EXPRESS CO. v. PLATE ICE CO.

No. 3261.

Circuit Court of Appeals, Fourth Circuit.

June 13, 1932.

George Rountree and J. O. Carr, both of Wilmington, N. C. (Carl H. Richmond, of Washington, D. C., on the brief), for appellant.

E. K. Bryan, of Wilmington, N. C. (W. B. Campbell and Bryan & Campbell, all of Wilmington, N. C., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

This suit was brought by the Plate Ice Company, a North Carolina corporation, against the Fruit Growers' Express Company, known as the Car Line, a Delaware corporation, for breach of a contract of November 7, 1921, between the parties, whereby the ice company sold and agreed to deliver, and the Car Line purchased and agreed to accept, all the ice that it might require during the period ending October 31, 1926, for the icing of refrigerator cars engaged in the transportation by railroad of perishable commodities originating at railroad stations within an extensive territory to be served from Wilmington, N. C. The contract contained the express statement that the requirements of the Car Line would vary from time to time, depending upon the amount of crops, train schedules, and the number of contracts in force between the Car Line and various railroads operating in North and South Carolina, for the furnishing to them of refrigerating cars and service. It was also agreed that the failure of the ice company to promptly ice the cars, as contemplated by the contract, might result in the spoilage of perishable commodities, and the ice company therefore agreed to indemnify the Car Line against any loss or damage accruing to the Car Line because of such failure., Reference was made to the plant of the ice company in a provision that the contract should become inoperative if "on account of unavoidable accident, fire or providential cause, the ice manufacturing plant or storage plant of the Ice Company shall be so damaged or destroyed as to render the Ice Company unable to comply with its obligation under this contract." By an addendum to the contract, the Hilton Lumber Company, another North Carolina corporation, largely interested in the ice company,

guaranteed the performance of the contract by it.

The case came on for trial before a jury, during which it was determined by the court, with the consent of the parties, that the question of liability should be determined therein, and that the issue of damages, if any should arise, should be referred to a referee. Thereupon testimony was offered, and the following issues were submitted to the jury: (1) Did the defendant wrongfully break its contract with the plaintiff, as alleged in the complaint, and (2) did the plaintiff first fail to perform its contract with defendant, as alleged in the answer? At the conclusion of the testimony the plaintiff moved for a directed verdict, and the court, being of the opinion that under a proper construction of the contract, and in accordance with the testimony, the defendant had broken the contract, and that if there had first been a breach on the part of the plaintiff it had been waived by the defendant, directed the jury to find both issues in favor of the plaintiff. The case was then referred to the referee to fix the damages.

The chief point in controversy relates to the construction of the contract as to the place of delivery of the ice contemplated by the parties, with particular reference to the following paragraphs of the agreement:

"1. The Car Line shall direct to be iced or re-iced such cars as its business hereunder may require to be iced or re-iced at Wilmington, N. C., and the Ice Company shall ice or re-ice such cars promptly as directed by the Car Line. * * *"

"3. It is mutually agreed that such ice is sold to be delivered by the Ice Company in the bunkers of refrigerator cars at Wilmington, N. C., as directed by the Car Line at the following prices. * * *"

The ice company contended, and the District Court ruled, that the place of delivery was its plant in Wilmington, N. C., while the Car Line on its part contended that, under the quoted paragraphs 1 and 3 of the contract, the ice company was obliged to deliver the ice at any point in the city of Wilmington, as directed by the Car Line. The dispute on this point between the parties arose by reason of a letter of August 25, 1924, wherein the Car Line notified the ice company that due to the great increase of crops, and the necessity to the railroad company of maintaining adequate and proper train schedules, the Car Line would thenceforth require ice at Wilmington only at the railroad company's Smith Creek yard in that city, delivered in bunkers of refrigerator cars; and the Car Line accordingly directed that all cars should thereafter be iced at the point indicated. This place was about one mile distant from the ice company's plant. The ice company denied the right of the Car Line to shift the point of delivery from the plant in Wilmington, at which deliveries had been made during the prior three years, and signified its refusal to accept the direction referred to. Thereafter, on November 28, 1924, the Car Line formally declared by letter to the ice company that, under the terms of the existing contract, the refusal of the ice company to ice the cars as directed constituted a breach of contract, and that it would thereafter make other arrangements for its supply of ice for the future. The ice company claims damages in this suit for the Car Line's refusal to accept deliveries from it during 1925 and 1926.

Coming to the construction of clauses 1 and 3 of the contract, it should be noted that the contract does not specify any particular place of delivery in the city of Wilmington. The general rule of law is that, where no place of delivery is specified in a contract of sale, the place of delivery is at the seller's place of business, in the absence of facts showing a contrary intention. Williston on Sales, § 450. The Car Line contends that this rule can have no application here because the ice company had no place of business. In fact, the ice was manufactured and delivered at the plant of the Hilton Lumber Company which owned all of the stock of the ice company. Nevertheless, it is obvious that this plant must be taken as the plant of the ice company for the purposes of this suit. The contract refers to the ice company's plant, and the evidence shows beyond question that thereby the parties meant the plant of the lumber company at which deliveries of ice under a previous contract between the parties had been made.

The contract does not lend itself to the interpretation for which the defendant contends. Paragraph 1 contains two correlative obligations: (1) An agreement by the Car Line that it will direct to be iced such cars as its business may require at Wilmington; and (2) an agreement on the part of the ice company that it will ice such cars promptly as directed by the Car Line. Paragraph 3 fixes the price for the ice delivered during the several years covered by the period of the agreement. It also states that the ice is "to be delivered by the Ice Company in the bunkers of refrigerator cars at Wilmington, N. C., as directed by the Car Line." The Car Line contends that the words "as directed"

signify the right to designate the place of delivery. We do not think so. If the language be read in the light of the general rule that when no place of delivery is specified, the seller's plant is intended, there is no real uncertainty in the contract. The requirements as to the number and identity of the cars to be iced could not be determined in advance, but only as the business arose. Thereupon it was the privilege of the Car Line to direct the ice company to ice the cars. The words "as directed," in paragraphs 1 and 3, are given full force and effect by making them apply to the identity and number of the cars to be iced, and the time when the work is required to be done. The evidence shows that the plant used by the parties was equipped with platforms and machinery for the loading of ice into the bunkers of railroad cars on sidings provided for that purpose. The substantial additional expenses necessarily involved in the transportation of the ice from the ice company's plant to points distant therefrom, there to be delivered into the bunkers of the cars at the will of the Car Line, makes it unreasonable to suppose that the parties intended the terms of the contract in the sense for which the Car Line contends. It is noteworthy in this connection that, for three years prior to the refusal of the Car Line to proceed under the contract, deliveries were made and accepted at the ice company's plant.

█ The Car Line's construction of the contract is based not only on the language of the document, but upon circumstances surrounding its execution which it claims should be taken into account. It is urged that the District Court wrongfully refused to receive in evidence two contracts, one of March 7, 1921, between the ice company and the Car Line, and a second of September 27, 1920, between the Atlantic Coast Line Railroad and the Car Line. We need not stop to consider the correctness of the court's rulings in this respect, for, even if the contents of these agreements are considered in connection with the language of the contract in suit, they do not bear out the interpretation for which the Car Line contends. The first of these contracts was preliminary to the contract in suit, and related to prior deliveries of ice into refrigerator cars. It differed from the contract sued upon, in that it was expressly provided that deliveries should be made at the ice company's plant, and it is said that the omission of this clause from the subsequent contract shows that the parties intended therein to change the place of delivery; but this conclusion does not follow when we bear in mind the ordinary rule of delivery at the seller's plant. There is no inconsistency between the two agreements in this respect, and, if the place of delivery had not been expressly designated in the first contract, the result would have been precisely the same.

█ The contract between the railroad company and the Car Line set out the obligation of the Car Line to furnish the refrigerator cars needed by the railroad company, and the agreement of the Car Line to indemnify the railroad company for any damages to shipments arising from the failure to ice the cars promptly and completely. The Car Line also agreed to erect and maintain upon locations to be mutually agreed upon by the parties, icing stations equipped by the railroad with necessary trackage facilities and buildings for the icing of cars; and it is contended, therefore, that the Car Line could not have intended that all of the ice should be delivered at a single point in the city of Wilmington, for to do this might disable it from carrying out its agreement with the railroad company. The ice company's attention was directed to the existence of contracts between the Car Line and railroads in North and South Carolina, but the evidence does not show that the details of these contracts were brought home to the ice company; and, even if this had been done, the situation would have been the same, for the contract between the railroad company and the Car Line covered the railroad company's requirements for refrigerator cars generally, and was not confined to Wilmington. Nothing in the circumstances surrounding the execution of the contract in suit suggested that delivery at the ice company's plant would not be satisfactory to all parties concerned.

█ Falling back upon a second line of defense, the car company next takes the position that even if its refusal to accept any ice from the ice company, except at the Smith Creek yard, was a breach of contract, the ice company is not entitled to recover because it first broke the contract by failing at various times during the seasons of 1923 and 1924 to make deliveries of ice when needed. There was evidence tending to show that the ice company in May, 1923, and again in May, 1924, was unable to supply all the needed ice; that it refused to accept emergency orders after the close of the usual business day; that its deliveries were unreasonably slow from time to time; and that the Car Line was obliged to accept deliveries under the contract at the plant of another manufacturer in Wilmington, the Independent Ice Company, in order to supply its demands. The ice company on its part offered evidence tend-

ing to deny or explain these circumstances, and to show that satisfactory settlements had been made. It may be assumed, for our purpose, that there was evidence of a prior breach by the plaintiff which would have justified a submission of the issue to the jury, had it been a good defense in this case. But the defense was not available here, because the Car Line not only paid in full for all deliveries in both of the years, but demanded and accepted further deliveries in each year after the breaches charged. No claim for breach of the contract was ever presented by the Car Line Company to the ice company.

It follows that, even if prior breaches by the plaintiff are conceded, they furnish no excuse for the action of the defendant in refusing to go on with the contract in the years 1925 and 1926. The rule is thus stated in Williston on Sales, § 191a: "Where one party to a contract fails to perform a condition, or breaks a promise which justifies the other party in refusing to perform and nevertheless, does not totally abandon or repudiate the contract or break it to such a degree as is equivalent to this, the injured party has a choice of two courses open to him—to go on with the contract or to stop performance. In choosing one course he necessarily surrenders the other. This principle is not inconsistent with the general rule that a surrender of rights requires a sealed release or consideration, because the choice made by election gives the party making it an advantage which he could not otherwise have had. Though he surrenders one right he gains or keeps, by so doing, another inconsistent right. If he chooses to continue performance he doubtless has lost his right to stop performance, but in the nature of the case he could not retain the two inconsistent rights. Election involves no requirement of mutual assent. It is a privilege of the injured party alone." Talcott v. Slater Bros. Co., 171 App. Div. 395, 157 N. Y. S. 499; Cory v. Logan Coal & Supply Co. (C. C. A.) 48 F.(2d) 28, 31.

For another reason, prior breaches of the plaintiff would not excuse the subsequent breach by the defendant. When the parties came to the breaking point towards the end of the season of 1924, the defendant based its demand for delivery at the Smith Creek yard upon the terms of the contract. It did not take the position that it was excused from further performance of the contract on its part because of prior failures of the ice company to make prompt and adequate deliveries during the years 1923 and 1924. The case therefore comes within the rule thus stated in Ohio & M. Railway Co. v. McCarthy, 96 U. S. 258, 267, 24 L. Ed. 693: "Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law." See, also, Luckenbach S. S. Co. v. W. R. Grace & Co. (C. C. A.) 267 F. 676, 679; Chevrolet Motor Co. v. Gladding (C. C. A.) 42 F.(2d) 440, 445.

Our conclusion is that the District Judge properly directed a verdict for the plaintiff on the issues of liability.

The defendant also objected to the action of the District Judge in overruling its exceptions to the report of the referee and confirming his findings on the subject of damages. It is not entirely clear whether the reference consented to by the parties was made under the common law (see Tiernan v. Chicago Life Ins. Co. [C. C. A.] 214 F. 238), or under the statutes of North Carolina (Code of 1931, §§ 572 to 579), which provide that the report of a referee may be set aside, modified, or confirmed in whole or in part by the judge. For the purposes of the case, we shall assume, as the parties have done, that the referee's findings were subject to review by the District Judge. The referee found the amount of ice that would have been supplied under the contract in 1925 and 1926 had it not been broken by the Car Line Company; the amount of money it would have cost to supply the ice, and, deducting this sum from the purchase price fixed by the contract, assessed the damages against the Car Line for the difference, with interest; that is to say, the sum of $17,015.97 for the year 1925, with interest at 6 per cent. from November 1, 1925, the end of the season, and the sum of $13,329.54 for the year 1926, with interest at 6 per cent. from November 1, 1926.

The defendant filed exceptions to the referee's report on the grounds, amongst others, (1) that the referee erred in finding that the ice company could have furnished the needed tonnage during the years 1925 and 1926, because there was no evidence to show that it owned or operated any plant at which the ice could be made, and (2) that the referee erred in basing his estimate of costs on evidence which purported to show the cost of manufacture by the Hilton Lumber Company, which was not a party to the contract. The testimony before the referee showed that all of the ice furnished under the contract at the plant of the Hilton Lumber Company

was made and delivered by it on its property; that it kept an account on its own books of all the costs of manufacture and delivery; that it had no contract of sale for the ice with the ice company; and that the checks delivered to the ice company by the Car Line in payment for the ice were turned over by the former without any deduction to the lumber company. The ice company had no plant of its own. These facts demonstrate that the objections mentioned to the referee's report cannot be sustained. It is obvious that the contract between the parties to this case was entered into by the ice company for and on behalf of the lumber company as an undisclosed principal; and the rule is well settled that, where an agent acts for an undisclosed principal and makes a contract in his own name, the agent may bring the suit in his own name, and the measure of damages is the same as though the action had been brought by the principal; the recovery being based upon the theory that the agent sues and recovers as trustee for his principal. Camp v. Gress, 250 U. S. 308, 319-320, 39 S. Ct. 478, 63 L. Ed. 997; Groover v. Warfield, 50 Ga. 644, 654; U. S. Telegraph Co. v. Gildersleve, 29 Md. 232, 246, 96 Am. Dec. 519; Leterman v. Charlottesville Lumber Co., 110 Va. 769, 772, 67 S. E. 281; Mechem on Agency (2d Ed.) § 2024.

 An exception to the referee's allowance of interest was also filed in the District Court on the ground that the suit was not brought to recover a fixed sum of money, but only for unliquidated damages. We think, however, that under the circumstances of this case it was within the discretion of the trial court to add interest to the amount of damages incurred, and we cannot say that the discretion reposed in the court was abused. The rule of law applicable to this subject has been stated as follows in Miller v. Robertson, 266 U. S. 243 at page 257, 45 S. Ct. 73, 78, 69 L. Ed. 265: "Compensation is a fundamental principle of damages whether the action is in contract or in tort. Wicker v. Hoppock, 6 Wall. 94, 99, 18 L. Ed. 752. One who fails to perform his contract is justly bound to make good all damages that accrue naturally from the breach; and the other party is entitled to be put in as good a position pecuniarily as he would have been by performance of the contract. Curtis v. Innerarity,

6 How. 146, 154, 12 L. Ed. 380. One who has had the use of money owing to another justly may be required to pay interest from the time the payment should have been made. Both in law and in equity, interest is allowed on money due. Spalding v. Mason, 161 U. S. 375, 396, 16 S. Ct. 592, 40 L. Ed. 738. Generally, interest is not allowed upon unliquidated damages. Mowry v. Whitney, 14 Wall. 620, 653, 20 L. Ed. 860. But when necessary in order to arrive at fair compensation, the court in the exercise of a sound discretion may include interest or its equivalent as an element of damages. * * * *"

See, also, Concordia Ins. Co. v. School Dist., 282 U. S. 545, 554, 51 S. Ct. 275, 75 L. Ed. 528; Druckman v. Forsyth Furniture Lines (C. C. A.) 22 F.(2d) 59.

 There were other exceptions to the findings of the referee, but it is sufficient to say that there was substantial evidence to support the referee's conclusions. In addition to the points raised by exceptions in the District Court, the defendant now urges upon this court certain errors said to have been made in the admission of testimony taken by the referee. A witness, who was an officer both of the ice company and of the lumber company, made use of a report of an audit of the books of the lumber company made by competent accountants in order to show the cost of the ice made at the plant in Wilmington during the years 1922, 1923, and 1924. It is objected that the accountant who made the audit was not produced as a witness in the case. When the evidence was introduced before the referee, all of the books of the lumber company were in court, subject to examination by the defendant, and it was testified that the audit had been prepared therefrom. The testimony was doubtless open to the formal objection noted before the referee, although there seems not to have been any reason to suspect the bona fides of the report or the accuracy of the figures. But the defendant filed no exceptions in the District Court to the admission of the testimony before the referee, and secured no ruling from the District Judge upon the admissibility of the testimony. It follows that we may not consider the assignments of error which relate to this point.

The judgment of the District Court is affirmed.