## JONES v. FOSTER.
### No. 3593.

Circuit Court of Appeals, Fourth Circuit.
April 3, 1934.

Henry Roberts, of Bristol, Va., and T. X. Parsons, of Roanoke, Va. (H. E. Widener, of Bristol, Va., on the brief), for appellant.

George S. Shackelford, Jr., and Charles F. Cocke, both of Roanoke, Va. (Estes Snedecor, of Portland, Or., on the brief), for appellee.

Before PARKER and SOPER, Circuit Judges, and CHESNUT, District Judge.

CHESNUT, District Judge.

The appeal in this case is from a judgment of the District Court in a suit at law, after jury trial, in the sum of $10,984.77 "with interest thereon at 6% from March 9, 1931," in favor of the plaintiff, a citizen of Oregon, against the defendant, a citizen of Virginia, who is the appellant here. The suit was brought to recover a balance in the hands of the appellant alleged to be due the appellee, as a result of a sale of certain shares of stock belonging to the appellee but held by the appellant as collateral security for a note of the appellee. The defence was based on certain counterclaims said to exceed the amount of the balance otherwise due. The district judge instructed the jury to allow one of these counterclaims, to disregard two, and to determine from the evidence the validity of another. The jury found that the principal of the balance due the plaintiff was $10,984.77, to which the judge added as a part of the verdict, the interest from March 9, 1931, in accordance with an instruction previously given to the jury. The relations of the parties, and the nature of the controversy over the several items of the counterclaims will appear from the following statement of facts which in themselves are not in dispute.

In 1927 the appellant, Jones, resided in Bristol, Virginia, where he owned and operated the Dixie Coca Cola Bottling Company. The appellee, Foster, was a salesman for a kindred company, travelling that territory. As a result of their business acquaintance they agreed to buy all the shares of stock of the Coca Cola Company of Portland, Oregon, with the understanding that Foster was to move to Portland and manage the business there as secretary and treasurer, and Jones was to be president but to continue to reside in Bristol and direct the policy of the business by correspondence chiefly; and, Foster being without capital, Jones agreed to advance the entire funds for the purchase, taking Foster's note for forty per cent. thereof secured by the same proportion of the stock, payable with interest in one year but renewable for reasonable periods; and Jones agreed to advance a limited amount of additional funds for working capital, it being recognized that the business would require a development period before becoming profitable and self-supporting. Accordingly the five hundred shares of stock

of the Portland Company were acquired for $35,000 and Foster gave his note to Jones for $14,000 secured by 200 shares of the stock. An informal written memorandum of agreement, dated November 4, 1927, was signed by Jones and verbally agreed to by Foster. It contemplated a formal written agreement to be prepared by counsel and it appears in the record that such a paper was prepared some three years later, but if so the record does not contain it and apparently it was never executed by the parties. Some part of the resulting controversy is doubtless attributable to this fact. The informal agreement provided that the salary of Foster should be at the rate of $200 per month for the first year, $250 for the second year, and $300 "when the plant earns a minimum of 6% on capital"; and "any increase in salary beyond $300 per month to be figured in ratio of stock owned at that time by Foster and Jones."

Pursuant to the agreement Foster went to Portland and took over the active management of the Company. By formal corporate action he was elected secretary-treasurer and general manager, with salary as agreed upon; and Jones was elected president, without salary. The duties of the president as specified in the By-Laws of the corporation included the "general supervision and management of the affairs of the Company" as well as other conventional duties pertaining to the office. The business of the company did not progress so well as had been hoped, and for two years it accumulated a loss of $29,000 and Jones advanced as loans over $40,000 for additional capital, raising the money with difficulty, the amount being much more than was originally contemplated. The third year showed better results but in the meantime Jones had become dissatisfied with Foster's management and decided to sell the stock, to which Foster very reluctantly consented in deference to Jones, as the former felt the necessary loss of the development years would be reflected in later gains. Finally Jones concluded a sale of the stock of both parties for $135,000 out of which the purchaser retained $33,069.91 for satisfaction of certain corporate debts, and paid the balance of $101,930.09 to Jones on March 9, 1931, on delivery of the whole capital stock of the Company, including the 200 shares belonging to Foster, the purchaser requiring Jones to give bond secured by his stock in the Dixie Company of the estimated value of $50,000, conditioned to satisfy other possibly existing indebtedness of the corporation which might develop in a year. Jones returned Foster's note showing payment of the $14,000 and interest from the proceeds of sale. Foster, not being informed of the exact conditions of the sale, asked for definite information but received somewhat indefinite replies from Jones who delayed the final settlement by supplying only partial information, even though some months later Foster sent his attorney from Portland to Bristol to ask Jones for an accounting for his profits on the sale of the stock. Finally, February 2, 1932, without prior further developments, Foster sued for the balance due him on the basis of such information as he had. In the account filed by him with the suit he charged Jones with the receipt of $101,930.09 from the purchaser of the stock, and credited him with $22,471.26 balance of principal of the loans made by Jones to the Company remaining unpaid, and with interest thereon at 7%, and also with the amount of several other items paid by Jones for the account of the corporation, leaving the net proceeds of the sale of stock in the possession of Jones $73,656.37, forty per cent. of which ($29,462.55) belonged to Foster subject to further credit for his cancelled note of $14,000 which, with accumulated interest and some other minor items, aggregated $17,701.95, leaving a net balance of $11,760.60 claimed by Foster.

Further deductions and counterclaims set up by Jones in the pleadings, and at the trial were: (1) An item of $1,939.59 for traveling expenses incurred in the business of the Company, forty per cent. of which was chargeable to Foster in proportion to his stock; (2) a claim for $10,000 against the Portland Company for special and extraordinary services rendered by Jones outside and beyond the scope of his agreed and regular duties as president; (3) a claim for $25,000 against the Company and Foster for services in effecting a sale of the stock of the Company for $135,000; (4) a claim for interest on Jones' investment of $21,000 in the original purchase of the stock calculated to March 9, 1931, in the amount of $4,879.59; (5) a claim against Foster that he should bear his proportion of the loss sustained by the Portland Company in operations for the first two years, which Jones attributed to the failure of Foster to follow instructions and conform to policies outlined by Jones; and (6) a claim for compensation to Jones from the Company and Foster based on the hazard incurred by Jones in advancing from time to time working capital to the corporation in the total amount of $41,383.22, although this amount with interest had been fully re-paid to Jones.

We will consider these counterclaims separately. As already stated, the jury were instructed to allow one of these claims (Item 1); to disallow two claims (Items 2 and 3), and to determine from the facts whether another (Item 4) should be allowed. The claims embraced in Items 5 and 6 were effectually disallowed by the rulings on the evidence. After the verdict the defendant moved for a new trial and in overruling it the district judge filed an extended memorandum which comprehensively discussed all of the defendant's contentions arising on instructions to the jury and rulings on the evidence, and gave his reasons for the rulings. We find ourselves in substantial accord with the views therein expressed with the exception only of the disposition made by the district judge of the matter of interest on the principal of the balance of indebtedness found by the jury, which subject will be hereafter discussed.

1. As to the first item of the defendant's counterclaims it is sufficient to say that it was allowed by the jury under instructions from the court.

2. In our opinion the jury was properly instructed to disallow the defendant's claim for special services to the corporation. The factual basis for it set up in the defendant's testimony was that by his oral agreement with Foster it was not expected that he should perform other than nominal duties for the corporation as president, including general advice and instructions as to business policy and management to be given by correspondence, and that he was to be compensated for any special services and paid his traveling expenses if required to take trips for the corporation; but that in view of Foster's poor management and failure to implicitly follow policies outlined, it became necessary for Jones to personally render special and extraordinary services, including within the more than three years' operation of the Company, two trips from Virginia to Portland, Oregon, each occupying two or three weeks' time, and also shorter trips to Cincinnati, Atlanta and one or two other places, in addition to writing several hundred lengthy letters to Foster as to the management of the business. In instructing the jury to disallow this claim the district judge acted on the view that the services performed were clearly not outside the scope of the duties pertaining to the defendant's office as president of the corporation in accordance with the By-Laws, especially when considered in the light of the original agreement or understanding between the parties and bearing in mind the defendant's personal interest as majority stockholder of the corporation and relation of creditor by virtue of the substantial loans to the corporation for working capital. In our opinion the view so taken is reasonable and sound. In the absence of an express agreement by the corporation to pay for services within the scope of the officer's duties there could be no valid claim for compensation. Baltimore Co. v. Dinning, 141 Md. 318, 321, 118 A. 801. But even if it should be conceded that the services were beyond the scope of the duties of the appellant as president, yet the conditions under which they were rendered were not such as to reasonably imply an expectation on the part of Jones to charge the corporation, or on its part to pay therefor. 3 Cook on Corporations (8th Ed.) p. 2498; Fitzgerald Const. Co. v. Fitzgerald, 137 U. S. 98, 111, 11 S. Ct. 36, 34 L. Ed. 608.

Moreover, if the services rendered to the corporation could have been properly made the basis of a special charge for compensation against it, we consider it entirely clear that the circumstances were not such as to impose any personal obligation on Foster to compensate Jones therefor. Jones never put forward any claim against the corporation for these services and never intimated to Foster in any way prior to the sale of the stock that such a claim would be advanced. At least so far as Foster is concerned, the claim, if it ever had any proper basis, must be considered to have been waived. There was certainly no express promise at any time by Foster to pay such a claim and the circumstances do not afford any reasonable basis for an implication of personal responsibility on Foster's part to recompense Jones for these services. The cases cited by counsel for the appellant in this connection are not controlling, as they illustrate only the general and undoubtedly correct legal proposition that special and extraordinary services, outside of his regular duties, performed by an officer of the corporation for its benefit and accepted by it may form the basis for a claim for special compensation beyond the salary allowed the officer for ordinary services, where there is a special promise by the corporation to pay or the circumstances are sufficient to imply the obligation, at least in the absence of a definitely prohibitory by-law. Fitzgerald Const. Co. v. Fitzgerald, 137 U. S. 98, 111, 11 S. Ct. 36, 34 L. Ed. 608; Corinne Mill Co. v. Toponce, 152 U. S. 405, 407, 14 S. Ct. 632, 38 L. Ed. 493; Pew v. First National Bank, 130 Mass. 391, 395;

Vaught v. Charleston National Bank, 62 F. (2d) 817 (C. C. A. 10); Denman v. Richardson, 292 F. 19, 23 (C. C. A. 9); Tietsort v. Irwin, 9 F.(2d) 65 (C. C. A. 6); Crown Cent. Pet. Corp. v. Bates, 37 F.(2d) 508 (C. C. A. 5); certiorari denied 281 U. S. 743, 50 S. Ct. 348, 74 L. Ed. 1156; Wood v. Lost Lake Mfg. Co., 23 Or. 20, 23 P. 848, 37 Am. St. Rep. 651; Enders v. Northwest Trust Co., 125 Or. 674, 268 P. 49; Rugger v. Mt. Hood Elec. Co., 143 Or. 193, 20 P.(2d) 412, 421, 21 P.(2d) 1100; Barrenstecher v. The Hof Brau, 67 Or. 194, 135 P. 518; Huffaker v. Krieger, 107 Ky. 200, 205, 53 S. W. 288, 46 L. R. A. 384; 14a C. J. 136; 3 Cook on Corporations (8th Ed.) § 657.

■ 3. In our opinion the jury were properly instructed to disallow the claim for commissions or compensation for services in effecting the sale of the stock. The sale was made by Jones on his own initiative and primarily for his own benefit and was acquiesced in by Foster only reluctantly. Prior to the sale Jones made no suggestion that he would expect personal compensation. Here again there was no express promise on the part of Foster and the circumstances are not such as to create a liability by implication. Robinson v. Lincoln Trust Co., 95 N. J. Law, 445, 448, 112 A. 733; 2 C. J. 752.

■ 4. As to the allowance to Jones of interest on his original investment of $21,000 before division of the profits of the sale of the stock between the parties, the jury were instructed to make or reject the allowance dependent upon their findings as to whether the original agreement between the parties, which was not wholly expressed in the informal memorandum, provided for such an allowance. On this point the testimony of the two parties was in direct conflict. As expressed by Jones, the full agreement between them was that he should be allowed interest on his investment before any dividend or profits should be paid on the stock, and there are some expressions in some of the letters or telegrams from Foster which tended to support this contention. But Foster's express testimony was that the agreement in this respect went no further than to provide that Jones should be entitled to interest on the loans made by him to the corporation, which in fact were repaid with interest. On this issue the jury found for Foster. As the testimony was conflicting, the defendant was not entitled to a peremptory instruction in his favor on this point as is now contended.

■ 5. Counsel for Jones contended that the Company's losses of $29,000 from operations should be set off against Foster's claim for balance of profits from the sale and requested an instruction that the jury should find for the defendant if they believed that the losses were the proximate result of Foster's mismanagement and failure to follow the policy and instructions laid down by Jones. In our opinion the trial judge properly refused this instruction. The sale of the stock for $135,000 subject to the payment of the debts of the corporation, was sufficient in amount to yield a net profit of approximately 100% to the parties on their original investment after operation of the Company for three and one-half years. The nature of the business was that it became more valuable, at least for the purposes of sale, in proportion to the increase in the annual sales of Coca Cola on a gallonage basis, and it is not disputed in the testimony that the result of Foster's management (at least after the first two years) was to materially increase the annual gallonage sold; and this was evidently a very important factor in enabling Jones through his business connections to effect the profitable re-sale of the stock of the corporation. Jones' complaint against Foster was that he failed to follow instructions as to business policies during the first two years which resulted in the loss of $29,000, without compensating increase in Coca Cola gallonage sold; but it is not contradicted that the parties contemplated an initial loss of some amount during the earlier period, and even in the third year, when Jones admitted that Foster had followed his policies as directed, there was also a loss of about $18,000, but with substantial increase in gallonage sold. The incurring of the losses was, therefore, apparently incidental to the development of the business rather than attributable to Foster's alleged mismanagement. And the possibility that the gallonage might also have been increased in the first two years is, we think, too speculative to be reasonably attributable to Foster's alleged failure to follow implicitly generalities of business policy outlined in correspondence by Jones from such a distance. But even if the contrary were assumed, there was an absence here of evidence which would justify a finding of any individual liability of Foster on this account, as an officer or manager of a corporation is not personally liable for loss in the business in the absence of wilful bad faith or gross negligence. 14a C. J. 102–105; Reus v. Conrad, 101 Md. 224, 60 A. 737. And

even if there had been some evidence to support the contention as to the latter, the claim would be properly asserted by the corporation and not by an individual stockholder. The contention by Jones as to Foster's mismanagement would seem to be completely answered by the admitted fact that Jones during the three and one-half years of alleged mismanagement by Foster made no effort to remove him although having power to do so as majority stockholder, and indeed he stipulated as one of the conditions of the sale of the stock that Foster should be retained by the new owners so long as his services were satisfactory, a condition which was met by Foster's continued employment up to the time of the trial.

6. The claim for compensation to Jones for the hazard of advancing a substantial amount of working capital to the Company over and above the amount contemplated, finds no support in the record. There was no instruction given or requested to the jury as to this item but the rulings on evidence effectively disallowed it. Here again there was neither an express promise by Foster nor do the circumstances create the obligation by implication. The money was loaned to the corporation without any agreement other than the obligation to repay, and it has been fully repaid with interest. The motive for making the loan was obviously to protect the investment that Jones had in the corporation.

In addition to the rulings heretofore discussed the appellant noted numerous exceptions to rulings on the evidence and has assigned many of them as error. We have examined them all but find no reversible error in these rulings. Most of them are based on the rejection of evidence offered by the appellant to support counterclaims which, as already stated, were not allowable. We deem it sufficient to specially mention two only. The appellant contends that evidence tendered by him to show that Foster had breached his contract, and therefore could not maintain the suit against Jones, was improperly rejected. Thus it is said that Foster agreed to carry life insurance policies payable to Jones to secure the note for $14,000 given for the purchase of forty per cent. of the stock, but failed to do so. While this is admittedly true, the answer thereto is that Jones suffered no loss as the note was fully paid and Jones was credited in the account with some small sums he had paid for premiums on the policies. Moreover the fallacy in this and other similar contentions of the appellant is that Foster was not suing on a special contract but for money had and received by Jones in the sale of Foster's stock, a development not in contemplation of the parties at the time of entering into the agreement for the purchase of the stock and the ensuing operations of the corporation. It is also urged upon us that the district judge erroneously excluded many letters in the three years' correspondence between the parties. What is particularly referred to is the rejection of some sixty letters or extracts therefrom first offered in bulk by the appellant, and then formally offered separately. The stated purpose was to support generally the appellant's counterclaims and particularly the one for compensation for special services to the corporation, on the theory that the letters written by Jones were themselves evidence of the special services and the business condition of the corporation due to alleged mismanagement. They were excluded on the ground that they were self-serving declarations and the writer as a witness on the stand could testify to any relevant facts within his knowledge, referred to in the letters, but the judge pointed out that particular letters might be admissible on the ground of admissions against interest or for some other special reason, and offered to admit such as were so admissible if tendered specifically. We think the ruling was correct. It was manifestly objectionable to offer such a large number of letters in bulk. Inserted in the record they cover about eighty pages. Nevertheless we have examined such of them as have been particularly referred to by counsel here and many others also. With one exception we are of the opinion they were not relevant and admissible. For the most part they are replete with redundant business advice, much of which may have been good, but irrelevant to the case, especially in view of the fact that the appellant's counterclaim for services to the corporation was not allowable. One letter from Foster would, if separately offered, have been admitted under the ruling as an admission, as it referred to the disputed jury issue as to the allowance of interest on Jones' investment. But at most it was only cumulative to similar statements in other letters or telegrams from Foster admitted in evidence, and also further referred to in the oral testimony. Under the circumstances we do not consider its rejection reversible error, as it was not particularly offered, or specially called to the judge's attention.

There remains for consideration the question of interest on the principal of the bal-

ance found due by the jury's verdict. What transpired was this. The judge instructed the jury to add interest at 6% from March 9, 1931, to the principal sum found due to the plaintiff. The jury rendered a verdict for $10,984.77, and thereafter on inquiry by the judge, the jury stated they had not considered the matter of interest and that the amount of the verdict represented the whole of the plaintiff's amended claim less forty per cent. of the defendant's travelling expenses, as above explained. Thereupon the judge, in the presence of the jury, and without dissent by them, and without objection then made by defendant's counsel, amended the verdict to read "with interest thereon at 6% from the date Jones got the money in hand, March 9, 1931"; and then the amended verdict was read as follows "we, the jury find for the plaintiff in the sum of $10,984.-77, with interest thereon at 6% from March 9, 1931"; and the Judge said:

"Gentlemen, That is done under the fixed opinion of the court, that the money was due him as of that date, and he is entitled to interest on it from that date."

Thereafter counsel for the defendant moved to set aside the verdict as not the verdict of the jury and for other reasons. Here the particular contention of the appellant against the inclusion of this interest is based on section 6259 of the Virginia Code which reads, in part, as follows:

"In any action whether on contract or for tort, the jury may allow interest on the sum found by the verdict, or any part thereof, and fix the period at which the interest shall commence."

This statute was called to the attention of the district judge but was regarded by him as a procedural statute not controlling in the federal court. The more recent Virginia decisions hold that in a Virginia court under the statute, it is error to instruct the jury as a matter of law that they should allow interest. Riverside Mills v. Branch, 147 Va. 509, 520, 137 S. E. 620, 624, 52 A. L. R. 213; Branch v. Riverside Mills, 147 Va. 522, 137 S. E. 614. In the former case the Supreme Court of Virginia said:

"It was error to instruct the jury, as a matter of law, that they should allow interest. Thos. Branch & Co. v. Riverside & Dan River Cotton Mills Co., Inc., 147 Va. 522, 137 S. E. 614, handed down at this term. In that case this is said: 'The allowance of interest should have been left to the jury.' Section 6259 of the Code provides: 'In any action whether on contract or for tort, the jury

may allow interest on the sum found by the verdict, or any part thereof, and fix the period at which the interest shall commence.' In Washington, etc., Ry. v. Westinghouse Co., 120 Va. 637, 89 S. E. 131, 91 S. E. 646, the declaration contained the common counts in assumpsit and also a special count upon the contract. The jury was given a peremptory instruction that if they found for the plaintiff they should allow interest from the time plaintiff's demand accrued under the terms of the contract, and the court held that this instruction was in conflict with the above-mentioned section *and was such an invasion of the province* of the jury as to constitute error.' " (Italics supplied.)

The language italicized is possibly indicative of the view of the Virginia Court that the statute is procedural in the sense that it regulates the respective powers of the judge and jury and if so, it would seem quite clear that the district judge in this case properly acted on the view that the statute as a procedural one was not binding in the federal court because not within the operation of the Conformity Act (28 USC § 724 [28 USCA § 724]) as construed and applied by the Supreme Court of the United States. Nudd v. Burrows, 91 U. S. 426, 23 L. Ed. 286; Indianapolis v. Horst, 93 U. S. 291; Jones v. United States, 258 U. S. 40, 49, 42 S. Ct. 218, 66 L. Ed. 453. On the other hand it is arguable that the effect of the statute is to declare the law of the state with respect to the recovery of interest and therefore under the Rules of Decision Act of Congress (28 USC § 725 [28 USCA § 725]) it became a part of the substantive law of the case fixing the rights of the parties. In this case the jurisdiction of the court was based only on diverse citizenship and the nature of the suit is an *action for money had and received* by the defendant in Virginia. In such a case it is clear enough in federal courts where interest is not specified in the contract but is awarded merely as damages for the breach thereof, the law of the state with respect to interest is to be applied. Concordia Ins. Co. v. School District, 282 U. S. 545, 51 S. Ct. 275, 75 L. Ed. 528; Barrow v. Reab, 9 How. 365, 370, 13 L. Ed. 177; Federal Surety Co. v. Bentley (C. C. A.) 51 F.(2d) 24, 27, 78 A. L. R. 1041; Jones v. Canadian National Ry. Co. (D. C.) 14 F.(2d) 852, 856; Chicago, M. St. P. R. Co. v. Busby, 41 F.(2d) 617 (C. C. A. 9).

But we find it unnecessary to decide in this case whether this Virginia statute is one of substantive law or procedure only. As-

suming that the District Judge acted correctly on the view that the statute was procedural only, nevertheless the nature of the case was such that the plaintiff was not entitled to a mandatory instruction to the jury that interest must be allowed on any principal sum found to be due and that such interest must be calculated from March 9, 1931. We attach no importance to the appellant's contention that the verdict as amended was not the verdict of the jury. The jury had been instructed by the judge that they should allow interest on any sum found to be due; but the jury neglected to do this. It would have been entirely proper procedure for the judge to have directed the jury to retire and add the interest, which they had not considered, to their verdict, and the addition of interest to the jury's verdict under the circumstances was a mere informality at the most which is without substantial significance beyond the fact that the verdict as thus rendered did not affirmatively include the allowance of interest by the jury in their own discretion. See 72 A. L. R. 1153. The substantial question, therefore, is whether the plaintiff was entitled to interest as a matter of law on the principal sum found by the jury. If the Virginia statute does not apply the plaintiff's right to interest in this case must be determined by the federal decisions. In Miller v. Robertson, 266 U. S. 243, 45 S. Ct. 73, 78, 69 L. Ed. 265, the Supreme Court said:

"Generally, interest is not allowed upon unliquidated damages. Mowry v. Whitney, 14 Wall. 620, 653, 20 L. Ed. 860. But when necessary in order to arrive at fair compensation, the court in the exercise of a sound discretion may include interest or its equivalent as an element of damages."

See also our recent decision in Fruit Growers' Express Co. v. Plate Ice Co., 59 F. (2d) 605, 610 (C. C. A. 4); and 17 C. J. 815; 3 A. L. R. 814.

▉ In our opinion it cannot fairly be determined as a matter of law that the plaintiff's claim was liquidated for a definite and certain amount on the certain day of March 9, 1931, the day on which the defendant received the check in payment of the stock. While the defendant undoubtedly had the money in hand from that date the exact amount due to the plaintiff was not then definitely determined but was dependent upon the final accounting involving numerous disputed items. Even after the plaintiff finally stated an account and demanded the balance, a further item of credit to which the defendant was entitled was discovered and the plaintiff filed an amended account. Still later the plaintiff's claim was further reduced by instructions from the trial judge in an amount of several hundred dollars. An even more substantial item of several thousand dollars was submitted for the determination of the jury who found for the plaintiff on the particular issue, although there was at least substantial evidence before the jury in support of the defendant's contention on that issue. Still further it will be remembered that the defendant to effect a favorable sale was obliged to put up personal bond with security of $50,000 for possibly undisclosed debts of the corporation which might develop within a year; and the defendant's knowledge of the outstanding debts of the corporation was based only on statements furnished by the plaintiff through correspondence. Considering all the factors of uncertainty with regard to the exact amount of the plaintiff's claim due on the final accounting, we do not think it can be said that it was of such a nature that he was entitled to interest on the balance due as a matter of law as of the certain date of March 9, 1931. In our view the case falls properly into the category where interest is allowable by the trier of facts (in this case the jury) as a matter of discretion and was not to be determined by the judge as a matter of law. Williston on Contracts, vol. 3, § 1413; 17 C. J. 815; 37 C. J. 1263, 1264; 39 Cyc. 836; 3 A. L. R. 809; Stephens v. Phoenix Bridge Co. (C. C. A. 2) 139 F. 248, 250.

▉ We are not dealing with a case where interest was expressly contracted for as in an agreement to pay a certain sum on a certain date with interest, or where a sum certain is otherwise definitely due and payable on a certain date to which interest attaches ordinarily from maturity by implication. On the contrary we have here a case where neither the amount due nor the date when due is fixed and certain. In such a case interest in the nature of damages is to be allowed or not in the discretion of the trier of facts. We think it cannot be said that it was absolutely necessary to allow interest in this case in order to arrive at fair compensation to the plaintiff. There were undoubtedly features in the case which might well have induced the exercise of discretion by the jury to allow interest to the plaintiff, especially the defendant's quite unjustifiable delay in making the final accounting. But on the other hand the jury decided what was at least a very debatable issue in favor of the plaintiff

involving the allowance of a sum much larger in amount than the item of interest here involved, and we cannot say that the defendant's contentions as to other deductions were so palpably unreasonable as to have been advanced in bad faith. We, therefore, conclude that the jury should have been instructed in this case that interest was to be allowed or not in their discretion. Ordinarily the failure to have done so would constitute error requiring a reversal of the judgment, but in the argument before us it was stated by counsel for the appellee that if the court should determine that interest was allowable only as a matter of discretion, and not as a matter of right, there should be a remittitur of this item of interest so erroneously added to the verdict. In accordance therewith we affirm the judgment with directions that the remittitur be entered by the clerk of the District Court in accordance herewith. Corporation of Charles Town v. Ligon (C. C. A.) 67 F.(2d) 238, 244; Fuller Co. v. Brown (C. C. A.) 15 F.(2d) 672, 678; Southern Gypsum Co. v. United Paper Board Co. (C. C. A.) 11 F.(2d) 58, 59; Mullins Lumber Co. v. Williamson & Brown Land & Lumber Co. (C. C. A.) 255 F. 645, 648, all heretofore decided by this court. In view of the special circumstances of this case, particularly the largely increased size of the Record by the inclusion of extensive correspondence rejected by the District Judge, the costs of the appeal will be equally divided between the parties.

Affirmed.