## Venus Oil Corporation et al. v. Gardner et al.

(Decided March 15, 1932.)

W. R. PRATER and D. C. BROWNING for appellants.

H. H. RAMEY for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing.

In a suit of the appellees, Tone Gardner et al., minority stockholders, against the appellants, Venus Oil Corporation and three majority stockholders and directors of that company, a judgment for $27,625 was rendered against F. E. Browning, David Browning, and I. B. Browning as excessive salary paid F. E. Browning, as general manager of the company during the ten years from 1921 to 1930, inclusive, and held by the court to be fraudulent as against the minority stockholders. Judgment against the same defendants for $550 was rendered on account of excessive salary paid I. B. Browning, as president, for the year 1930. Both sums were adjudged to be paid to the corporation for the benefit and use of all of its stockholders. The three majority stockholders who were in charge of the management of the affairs of the corporation as directors were enjoined from paying any sum in excess of $50 a month for services to be rendered by the two named defendants in the future. They were also ordered to keep the records and accounts of the company open at all reasonable times for the inspection of the minority stockholders and to make and furnish them annually a financial statement of the company. Other

charges of mismanagement were ignored by the judgment, but the prayer for a receiver was denied. The defendants appeal.

Before stating the facts, it may be well, first, to consider the applicable law in cases of this kind. The court may not intervene or interfere in the internal affairs of a corporation at the instance of minority stockholders unless its governing authorities have acted or are threatening to act fraudulently, in the broad sense, against them or have abused the implied trust reposed in officers and directors in such manner or to such extent as to warrant the interposition of equity. Huffaker v. Krieger's Assignee, 107 Ky. 200, 53 S. W. 288, 21 Ky. Law Rep. 887, 46 L. R. A. 384; Manufacturers' Land & Improvement Co. v. Cleary, 121 Ky. 403, 89 S. W. 248, 28 Ky. Law Rep. 359; Poutch v. National Foundry & Machine Co., 147 Ky. 242, 143 S. W. 1003, 1004; Beha v. Martin, 161 Ky. 838, 171 S. W. 393; Haldeman v. Haldeman, 176 Ky. 635, 197 S. W. 376; Carter v. Louisville Railway Co., 238 Ky. 42, 36 S. W. (2d) 836.

Of special pertinency is the following quotation from the Poutch case:

> "It is true the directors hold a position of trust. It is their duty to manage the business of the corporation honestly and with fidelity. As they occupy a position of trust when they vote a salary to one another, they cannot keep the money if they act to the prejudice of the corporation. . . . The general rule is that the action of the directors must be a fraud on the corporation, actually or constructively, before the directors can be held liable."

The burden is upon the objecting stockholders to establish affirmatively that compensation allowed was unreasonable and excessive. Beha v. Martin, supra.

The only evidence presented by the plaintiffs to sustain their pleading is that of an accountant who, at the direction of the court, examined the books of the corporation. Aside from evidence as to the accounting, the witness was asked and gave some opinions and conclusions. For the defense another accountant who, about four years before this litigation started, had examined the books for the minority stockholders and who, at the defendants' instance, had brought his examination to date, was introduced; and I. B. Browning, one of the

defendants, testified in a general way concerning the work done and the management of the company's affairs. The evidence of both accountants is presented principally through their reports. Technically, much of this evidence was incompetent. See Edelen v. Muir, 163 Ky. 685, 174 S. W. 474. But no exceptions were filed.

The company was organized in 1920 by the three Brownings and A. B. Patrick and Sam J. Patrick, with a capital stock of $150,000, divided into shares of $10 each. The parties transferred to the corporation an oil and gas lease on 69½ acres in Magoffin county, at a valuation of $109,000, for which stock was issued to them. Stock of the par value of $41,000 was sold for cash. Later the capital stock was increased to $200,000, but only $770 worth was sold, so that there was at all times outstanding $150,770 in stock, of which the individual defendants owned about 90 per cent. Appellees claim that the lease transferred to the company was not worth more than $60,000, the evidence thereof being a statement to that effect made by one of the defendants to the accountant. But that matter is not before us.

With the cash capital and the earnings, fifteen oil wells were drilled on this lease during the first two years. During the period involved those wells produced 166,445 barrels of oil, which was sold for the gross sum of $347,307.73. The operating and other income (disregarding depletion and depreciation charges) for the period was $272,443.48; and the dividends paid amounted to $225,775.93, an equivalent to 150 per cent on the capital stock. This sum represented an average dividend for the eight years of production of about 18 per cent per annum. The appellees, however, say that that is not the true criterion of the earnings, for the sum so paid to the stockholders represented the return of the capital invested inasmuch as the property has been progressively exhausted. Upon that theory the stockholders have recovered their investment and only about $75,000, or around 4 per cent per annum thereon. In the accounting, the balance sheet showed in the beginning as "lease-held account," represented by expenditures for the lease and development, $163,613.36, and what is called a "discovery value," allowed by the federal government for income tax purposes, of $238,677.11, or a total property asset of $402,290.47. During the period the "property value" has been reduced by $264,450.08 through annual

depletion charges against the leasehold value and depreciation charges against buildings, machinery, etc. At the close of the period on June 30, 1930, the assets are given a book value of $143,252.65, with liabilities of $2,003.70, or a net value of $141,249.58, or only $9,520.42 less than the capital stock. This shows a book value of about 90 cents on the dollar. Of more practical significance is the fact that the company still owns the lease, and that 14 wells are yet producing oil. The other one is being used for the pumping of air into the pool to secure a continuation or increased production. The evidence of the plaintiff is to the effect that the oil is about exhausted and the stock is not worth over 20 cents on the dollar, while that of the defendants is to the effect that there is much more oil in the lease, and that the company will continue to receive much revenue from it in the future. The plaintiffs say the property is not worth over $20,000, while Mr. Browning makes the broad and bold statement that only 10 per cent of the oil has been recovered, and there is a million and a half dollars worth of recoverable oil in the pool yet. Be that as it may, the accounts seem to reflect a satisfactory investment of the kind and a proper management. Certainly, the result does not indicate any spoliation or waste.

The minority stockholders had representation on the board of directors through the Patricks for several years, and later the plaintiff, Tone Gardner, was elected a director, but never attended any of the meetings, although there is evidence that he received notice of at least some of them. There is no evidence, except some general references, as to what occurred at any of the board meetings. The minutes were not regularly kept, and at the time of the trial some shorthand notes of what had occurred at the last several meetings had not been transcribed. The only specific evidence of any action of the board is that in 1920 four of the five members were present and voted a monthly salary of $350 to F. E. Browning, as general manager, and others show that dividends were declared from time to time to be designated as a return of the capital. Some of the evidence of the accountant was based upon verbal information obtained from the president, I. B. Browning. There was only one executive or administrative officer of the company who drew a salary. That was F. E. Browning, who, according to plaintiffs' evidence, was paid for his services as general manager, in 1921, the sum of $4,000, during which

year the gross income was $28,833. The net income (disregarding depreciation) was $20,382. He was paid $4,200 a year during 1922, 1923, 1924, and 1925, during which the average gross income was $58,945, the net, $50,345, and dividends of $43,817 were paid. In 1926 his salary was $3,700, and the gross income $31,556; net income $23,154, and dividends $22,615. For 1927 and 1928 his salary was $3,000 a year; the average gross income was $14,600, the net $9,497, dividends $10,176. In 1929 his salary was $3,000 a year; the average gross income was $5,489, and dividends $6,030. For the six months in 1930, he was paid $625; the gross income being $4,905, the net $1,441, dividends $1,505. Plaintiffs' witness testified from "general information" that after development of the property, which he says was during the last five years, the only duties devolving upon the manager were those of keeping the books and receiving and disbursing the funds of the company, for which services he estimates $600 to $1,000 a year would be ample compensation.

The accountant introduced by the defendants brought his figures to September, 1930, and construed some of the bookkeeping entirely differently, especially those relating to the so-called "discovery value" and "depletion charges." His construction of the statistics was more favorable to the defendants. I. B. Browning was the only one of the parties who testified. He stated that his brother, F. E. Browning, was a geologist and had devoted much of his time and talents to the development and management of the company's property, and, without here detailing it, it may be said that his evidence showed the general manager earned all of the salary paid him. It appears the company engaged in other ventures than the development of the original lease, but they were unprofitable. We have searched the record in vain for any evidence with reference to the salary paid I. B. Browning during the year 1930 upon which the judgment relating to his salary was based.

The circuit court was of the opinion that F. E. Browning's salary for the first five years should not have been more than $75 a month; for the past five years not more than $50 a month; and that the services of I. B. Browning, as president in 1930, were not worth over $100, whereas he was paid $650. The judgment was the difference between the aggregate of these sums and the total amount paid the officers.

From the evidence as a whole it may be said that perhaps the directors were not as careful to observe regularity in their corporate management as they might have been, and that in the last year or so the salary paid the general manager was quite liberal as measured by the income of the company. It is not shown that there was any concealment or effort at concealment of their management from the minority stockholders. The evidence of I. B. Browning that they were at liberty at any time to examine the affairs of the company, and that they never asked to participate in the management is not denied. In 1926, an accountant employed by them was given access to the books. As stated, the plaintiffs rested their case altogether on the evidence of the accountant who stated he had never engaged in the oil business and who, obviously, was not in position to testify from his own knowledge as to the activities and the services of the general manager, whose salary was attacked as being excessive. The books of a concern may sometimes reflect such extravagance as to authorize the court to grant relief to the minority stockholders, but ordinarily the value of services or the reasonableness of the compensation of an officer cannot be determined by a consideration of the income of the company solely and alone. Certainly, these statistics do not make out such a case as authorized the judgments that the directors had been so extravagant with one of their number in the matter of his salary as to constitute a fraud upon the stockholders or to authorize any injunctive interference in their future management.

The judgment is reversed, with directions to enter an order denying the prayers of the petition.