## GREENE COUNTY NAT. FARM LOAN ASS'N et al. v. FEDERAL LAND BANK OF LOUISVILLE et al.

### No. 671.

District Court, W. D. Kentucky, at Louisville.

Nov. 15, 1944.

Susong, Parvin & Fraker and B. B. Fraker, all of Greenville, Tenn., and William F. Clarke, of Louisville, Ky., for plaintiffs.

William C. Goodwyn, of Louisville, Ky., John E. Lee, of Kansas City, Mo., Eli H. Brown, III, U. S. Atty., of Louisville, Ky., W. Carroll Hunter, Sp. Asst. to Atty. Gen., and Robert H. Shields, U. S. Dept. of Agriculture, of Washington, D. C., for defendants.

MILLER, District Judge.

This action was filed by four National Farm Loan Associations with their principal offices in Greene County, Tennessee, against the defendants the Federal Land Bank of Louisville, the individual members of its Board of Directors and the Farm Credit Administration to enjoin the defendant bank from carrying out a plan proposed by it, and approved by the Farm Credit Administration, which, among other things, provides for the cancellation of certain indebtedness owed to the bank and for the distribution by the bank of funds for the purpose of improving the financial condition of certain of the National Farm Loan Associations in the Fourth Farm Credit District. The Farm Credit Administration has previously been dismissed as a defendant on the ground that it was not a corporate entity subject to suit. The facts have been stipulated and the matter is now under submission in chief.

The matter is one arising out of the Farm Credit Administration, as set up and controlled by 12 U.S.C.A. § 636 et seq. Under that legislation the Continental United States, excluding Alaska, is divided into 12 farm credit districts with a Federal land bank in each district. The district of the defendant, the Federal Land Bank of Louisville, is the Fourth Farm Credit District and comprises the states of Ohio, Indiana, Kentucky and Tennessee. The Act provides for the organization by persons desiring to borrow money on farm mortgages of corporations to be known as national farm loan associations with the charter of each association specifying the territory within which its operations are to be carried on. The Farm Credit Administration is vested with supervisory authority over the Federal land banks and national farm loan associations, subject to the general control and direction of the Secretary of Agriculture. The banks and the associations are instrumentalities of the Federal Government and function cooperatively as inter-dependent operating units in the rendition of the long-term farm mortgage loan service provided by the Act. There were in existence on December 31, 1943 3024 associations in all the farm credit districts, including 432 associations in the Fourth Farm Credit District, of which the plaintiffs are four.

The authorized capital stock of the Federal Land Bank of Louisville is $20,000,000, divided into 4,000,000 shares with a par value of $5 each. The Government subscribed to the original capital stock of the Federal land banks, and thereafter made additional subscriptions to the banks' capital stock and also made subscriptions to their paid-in surplus. The defendant bank by December 31, 1924, had completed its return to the Government of the amount of its original capital stock subscribed by the Government, and in 1940 the bank completed its return to the Government of the amounts of both the additional capital stock and paid-in surplus subscribed by the Government. At the time of the filing of this action on January 5, 1944, the plaintiffs were owners of shares of the capital stock of the Federal Land Bank of Louisville as follows:

| | |
|---|---|
| Greene County Association | 4318 shares |
| Hamblen County Association | 1197 shares |
| Oakhurst Association | 890 shares |
| Hancock Association | 707 shares |

Practically all of the stock was owned by National Farm Loan Associations in the

States of Ohio, Indiana, Kentucky and Tennessee.

A prospective borrower makes application to the association for membership therein. The loan is made by the bank only after the approval thereof by the association and by a land bank appraiser who is a public official appointed by the Farm Credit Administration. The association endorses all loans made by the bank through it and services outstanding loans. The borrower is required to purchase stock in the association in the amount of $5 for each $100, or major fractional part thereof borrowed, and pledges this stock as collateral security for the loan. The association in turn purchases a like amount in the bank and pledges such stock as collateral security for its endorsement liability. The stock of the borrower and of the association is required to be paid off at par and retired upon payment by the borrower of the loan in full. But in instances where an association is indebted to the bank, as for example where another borrower has defaulted in his loan on which the association is the endorser, the proceeds of the stock of such association in the bank are set off against such indebtedness. Since such an association does not receive in cash the proceeds from the retirement of its stock in the bank, it is unable to pay to the borrower who has paid his loan the amount to which the borrower is entitled for the retirement of his stock in the association. In such instances the association issues to the former borrower a "Stock Retirement Certificate" which recites that the stock certificate has been cancelled, the shares of stock have been retired, and "Therefore, this certificate is issued to evidence the right of the above-named person, after all obligations of said association shall have been satisfied, to share in its net assets, together with any other persons having similar rights, on the basis of the number of shares held by each, and not to exceed the par value of said shares." At the time involved in this litigation these outstanding Stock Retirement Certificates of such associations in the Fourth Farm Credit District totaled $1,004,875.

For many years the defendant bank absorbed losses incurred in connection with loans made by it and endorsed by national farm loan associations. In 1929 the bank discontinued its practice of thus absorbing losses on endorsed loans. The capital stock of many associations became impaired, and since an association with impaired capital could not accept applications for new loans, the income in the form of fees from applicants was cut off. Many associations became disabled and many others are on the borderline of disability. This result frequently was attributable to the smallness of the associations' territory, overlapping of its territory with the territory of another association, or too small a volume of business for a prudent distribution of risks. At the time involved in this action there was an existing indebtedness to the Federal Land Bank of Louisville from insolvent associations in the net amount of $1,480,286.41, after applying the proceeds of capital stock of such former members of such associations as had paid their mortgage loans in full without receiving the proceeds of their stock, amounting to $1,004,875 as above referred to.

Associations are classified according to their financial condition. A class 1 association is an association which is solvent in all respects. A class 2 association is an association apparently unable to meet its obligations currently without a present impairment of capital, but which is expected to work out its difficulties within a reasonable time. A class 3 association is an association which is unable to meet its obligations currently without a material impairment of capital but which impairment will not exceed its par value of its capital stock. A class 4 association is an association with a total impairment of capital. Of the 3024 associations in all districts as of December 31, 1943, 1487 were in class 1, 49 in class 2, 665 in class 3, 823 in class 4. The total number of associations in the Fourth Farm Credit District on June 30, 1943, was 434 associations, of which 282 were in class 1, 23 in class 2, 83 in class 3, and 46 in class 4. Each of the plaintiff associations is classified as a class 1 association.

The general policy of Federal land banks during the first 12 years of their existence was to pay small dividends annually. In January 1932 the Act was amended so as to provide that no dividend could be declared by any bank without the approval of the Farm Credit Administration. No dividend was paid by any bank during the period of 1932 through 1943. The financial condition of the Nation for several years following the last dividend by the defendant bank was such as to make a dividend impractical. A dividend was declared by

the directors on December 16, 1941, which the Farm Credit Administration declined to approve. The directors of the defendant bank did not make any further declaration of dividend for the reason that it was well-known to them that the Farm Credit Administration, because of certain existing factors affecting the financial condition of the entire Federal land bank system, would not approve a dividend by the defendant bank or any other Federal land bank. As of December 31, 1943, the outstanding capital stock of the Federal Land Bank of Louisville was $7,911,630, while its legal reserve at that time was $11,338,700. As of the same date it had a total of earned surplus, undivided profits and certain reserves of $12,616,141.94. The 12 Federal land banks had outstanding on December 31, 1943, Consolidated Farm Loan Bonds amounting to $1,361,866,900, of which $128,902,100 were issued on behalf of the defendant bank.

The directors of the defendant bank adopted a resolution on July 19, 1943, approving a plan of the bank submitted by the executive officers of the bank, which is the plan under attack in this suit. The plan was approved by the Farm Credit Administration on July 31, 1943. On November 15, 1943, the plan had been approved by more than 80% of the associations by action of their directors and was declared by resolution of the bank's board to be operative as of December 1, 1943, if and when accepted by the stockholders of not less than 70% of the associations. The Farm Credit Administration approved the action of the board in this respect on November 19, 1943. On January 1, 1944, the executive committee of the bank adopted a resolution reciting that the plan had been accepted by appropriate action of the stockholders of 71.52% of the associations, and thereupon placed the plan in effect as to such associations as of December 1, 1943.

The plan provides for cancellation by the bank of the then existing indebtedness to it of insolvent associations amounting to $1,480,286.41, and that the further sum of $1,004,875 be made available by the bank for the purpose of satisfying the claims of former members of such associations as had the outstanding stock retirement certificates totaling that amount. The plan provides also for the establishment by the bank of reserves to the extent necessary to take care of estimated foreseeable losses for which associations are liable. These reserves are available to all associations, including associations in the class of the plaintiffs, to the extent necessary to provide for such foreseeable losses. The giving of credit on indebtedness to the land bank, the payment of funds to liquidate the claims of former stockholders, and the establishment of reserves against further losses are not based on the amount of the capital stock held by the association. There is no provision in the plan for the payment of any sum to associations that are in good standing, and whose capital stock is not impaired. The bank estimated that the plan would result in savings to the bank of $308,650 annually, and that these savings would absorb the cost of the plan over a period not exceeding 8½ years. A detailed statement of the estimated savings is filed as exhibit No. 61 with the stipulation. The plan provides also for the reduction in the number of associations in the district from 434 to 94 by consolidations. The plan does not contemplate repayment by the associations of the funds by cash or credit. It is intended and is a part of the plan that no association, whether in class 1, 2, 3 or 4, shall participate in either payments, credits, or reserves against future losses unless it agrees to such consolidations as the defendant bank shall propose. The legal aspects of the plan as adopted were approved by counsel for the defendant bank and by the legal staff of the Department of Agriculture. The Federal land banks of Columbia, New Orleans, St. Louis, St. Paul, Omaha, Wichita, Houston and Berkeley have developed generally similar plans in their respective districts. The plans of the banks in six districts, namely, Columbia, New Orleans, St. Paul, Houston and Berkeley have been in operation for periods ranging from several weeks to nine months. At the time of the institution of this action, the defendant bank had paid to associations in class 3 and class 4 to enable them to pay Stock Retirement Certificates the sum of $979,144.80.

The plaintiffs contend that the carrying out of the plan will constitute an illegal and misuse of corporate funds and cause to them and all other stockholders in a like situation irreparable injury; that the financial condition of the defendant bank both justifies and requires in fairness to the stockholders of the bank that a substantial dividend be declared and paid, and that the defendants are acting fraudulently, unreasonably and not in good faith

in failing and refusing to pay a dividend; that the payment of the sum of $979,144.80 already made is illegal except in the event that it be considered and treated as a dividend, in which event all other stockholders of the bank are entitled to a dividend which would remove such discrimination between stockholders; and that the board of directors of the defendant bank have been guilty of willful mismanagement and misuse of the corporate funds and assets. They ask by their complaint that the defendant bank and the individual directors be enjoined from using the corporate funds and assets as provided by the plan, that they be required to declare and pay to the plaintiffs and all other stockholders of the defendant bank a reasonable dividend on the capital stock held by them, and that they have judgment against the defendant directors individually for the loss caused by the illegal payment of the funds already distributed. In an amended complaint they pray that the disbursements already made be held to constitute a dividend and that they and all other stockholders recover similar amounts based upon the stock held by them respectively. The defendants by their answers state that the defendant bank proposed the plan to national farm loan associations in the Fourth Farm Credit District in pursuance of a sound business policy which is consistent with, and in furtherance of, the purpose of Congress to extend to farmers through Federal land banks long-term mortgage credit service on favorable terms at the lowest practicable cost; that the plan of the defendant bank, and the substantially similar plans of several other land banks, have been submitted to, and approved by, the Farm Credit Administration in the exercise of its statutory general supervisory authority over the banks and national farm loan associations; that the law provides that only in exceptional cases may the credit service of the banks be rendered otherwise than through the associations; that the financial integrity of associations is indispensable to the attainment of the purposes for which they were established; that the services of associations which operate as an uneconomic unit, or in duplication of the service of other associations, or in overlapping territory, are characterized by inefficiency and costliness, and associations which are insolvent can not serve the purposes for which they were established; that under the plan, insolvent associations will be restored to solvency, and, through consolidations and rearrangement of chartered territories, the 434 associations will be reduced to 94 sound, self-sustaining, economic units; that the defendant bank's cancellation of the indebtedness of insolvent associations, its establishment of reserves for the benefit of associations to cover foreseeable losses, and its making available money to enable the restored associations to refund the stock interest of former borrowers, are steps necessary in the fulfillment of the plan; that the consummation of the plan will result in such savings of operation by the defendant bank as will absorb the cost of the plan over a period not exceeding 8 years and, through the maintenance of confidence in them, will enable the bank and the associations more adequately to effectuate the purpose of Congress continuously to provide a source of long-term mortgage credit at reasonable rates, with consequent greater readiness of farmers to avail themselves of this service; and that the plan adopted represents the best judgment of the bank, is consistent with governmental and sound business policy, has been approved by the Farm Credit Administration, an agency of the United States vested by statute with supervisory authority over Federal land banks and associations, and also by a large majority of the associations, and is in accordance with law.

At the outset it is necessary to realize that the question involved is one of corporate law rather than one of contract law. The action is not one by a party to a contract either to enforce the contract or to recover damages for its breach. On the contrary, it is an action by a few stockholders of a corporation to enjoin corporate action which has been authorized and directed by the corporation's board of directors. Accordingly, we are not concerned with whether or not the plan is a contract supported by consideration in its contractual sense, but there is presented for consideration and decision the plain issue of whether or not the carrying out by the corporation of the proposed plan is such unauthorized corporate action as will be enjoined by a court at the instance of a few minority stockholders who disagree with the purposes and wisdom of the plan. We will consider in turn the various parts of the plan from this point of view.

█ The plan contemplates that the bank make available to the associations the sum of $1,004,875 for the purpose of satisfying the claims of former members of such

associations as had the outstanding Stock Retirement Certificates totalling that amount. A corporation, like an individual, may at times be confronted with a situation that requires the expenditure of money to properly meet the danger arising therefrom. This is particularly true of a bank when some of its outstanding loans have defaulted and prompt liquidation of the account would result in greater loss to the bank than would result from advancing funds to provide a more orderly liquidation or a more favorable salvage. The authority of a banking corporation to make such advances or payments in order to extricate itself from a perilous situation is well established in this Circuit. Atherton v. Anderson, 6 Cir., 86 F.2d 518, 524, 525. In that case the court approved the advancement by the National Bank of Kentucky of substantial sums to take over the business of the Kentucky Wagon Manufacturing Company, an insolvent debtor, for the purpose of eventually salvaging more from the wreck than would be realized by abandoning the debtor to the court of bankruptcy. The Court presented the proposition in that case in the following manner:

"The bank was manifestly faced with the problem of either taking its then present loss or considering some reasonably feasible and permissible plan to reduce or eliminate it. To have remained idle, to have awaited speculative results of a bankruptcy sale was a course not dictated by prudence or sound business judgment, and to have refused to consider any reasonable plan for saving the going concern value of the wagon works might indeed have submitted its directors to charges of negligence, for both district judges who had supervised the bankruptcy proceedings had ordered the receivers to continue operations to save going value. * * * The controlling principle seems to us to be that while the bank has no power, either express or implied, to enter upon an original speculative enterprise, yet as an incident to its express powers the bank has a right to acquire property, to put it in condition for resale, and where such property is a manufacturing establishment whose value depends substantially upon interrupted operation, we think implied power exists to continue such operation for a time providing the primary purpose of the bank is to save its debt rather than to speculate in future profits, and there is reasonable prospect of realization. How much new money may to that end be invested, and how long such operation may continue, must depend, of course, upon the necessities and peculiar circumstances of each individual transaction. The particular problem envisioned may not be resolved by the application of arbitrary or empirical tests, and much must be left to the business judgment of those responsible for its solution if such judgment is honestly exercised."

■■ The opinion also pointed out that a bank may do in its own behalf whatever natural persons may do under like circumstances. In taking such protective action a bank can even validly release a statutory lien which it has against its own outstanding stock, or may enter into a contract of guaranty when reasonably incidental to its authorized business. National Bank v. Watsontown Bank, 105 U.S. 217, 221, 26 L. Ed. 1039; Green Bay & M. R. Co. v. Union Steamboat Co., 107 U.S. 98, 2 S.Ct. 221, 27 L.Ed. 413; Henderson Tire & Rubber Co. v. Gregory, 8 Cir., 16 F.2d 589, 595, 49 A.L. R. 1503; Marbury v. Kentucky Union Land Co., 6 Cir., 62 F. 335; Lyon, Potter & Co. v. First National Bank, 8 Cir., 85 F. 120; General Investment Co. v. Bethlehem Steel Corp., D.C.N.J., 248 F. 303.

■ The plan also provides for cancellation by the bank of the existing indebtedness to it of insolvent associations amounting to $1,480,286.41. Whether or not a corporate creditor should exercise to the fullest extent its legal rights against a defaulting debtor is essentially a question of business policy and business judgment. There is no law which arbitrarily requires a corporate creditor to push its debtor to the wall or to destroy him by forcing him into bankruptcy. The question involved is very similar to the one discussed above, namely, what corporate action is most advisable from the viewpoint of the ultimate benefit to the corporation. Numerous decisions have recognized the right of corporate management to refuse to assert and press valid claims against debtors, and its right to compromise claims on a basis other than strict dollars and cents, when such action was accompanied by a reasonable probability that the best interest of the corporation would be served by so doing. Hawes v. City of Oakland, 104 U.S. 450, 462, 26 L.Ed. 827; United Copper Securities Co. v. Amalgamated Copper Co., 244 U.S. 261, 37 S.Ct. 509, 61 L.Ed. 1119; First Nat. Bank of Charlotte v. National Ex-

change Bank of Baltimore, 92 U.S. 122, 23 L.Ed. 679; United States v. Union Pacific R. Co., 98 U.S. 569, 610, 611, 25 L.Ed. 143; Post v. Buck's Stove and Range Co., 8 Cir., 200 F. 918, 43 L.R.A.,N.S., 498. See also Trimble v. American Sugar Refining Co., 61 N.J.Eq. 340, 48 A. 912.

■ The plan provides also for the establishment by the bank of reserves to the extent necessary to take care of estimated foreseeable losses for which associations, whether impaired or not, are liable. This feature of the plan gives assurance that each consolidated association will not be exposed immediately to the danger of impairment of its capital stock through the occurrence of any loss covered by the reserve, and will be placed in a position which will enable it to fully perform its functions both during the transition period and in the future. It is in effect an indemnity on the part of the bank to the extent of such losses. The authority for a corporation to execute an indemnity agreement as a means of extricating itself from a perilous situation arising in the course of its business, when done in good faith and for the best interests of the corporation, is established by many decisions. Second National Bank of Parkersburg, W. Va., v. United States Fidelity & Guaranty Co., 4 Cir., 266 F. 489; Modoc County Bank v. Ringling, 9 Cir., 7 F.2d 535; Gotham National Bank v. Sharood, 2 Cir., 23 F.2d 567; Dunn v. McCoy, 3 Cir., 113 F.2d 587; Allis-Chalmers Mfg. Co. v. Citizens Bank & Trust Co., D.C.Idaho, 3 F.2d 316; McCoy v. Adams, D.C.E.D.Pa., 29 F.Supp. 815.

■■ The plaintiffs strenuously contend that the net effect of the plan as a whole is essentially a gift by the bank of its assets to those associations which are insolvent to the prejudice of those associations' stockholders who because of being solvent do not participate in the distribution. They urge upon the Court the well established principle that a corporation can not legally give away its assets over the objection of protesting stockholders. If the execution of the plan is in effect a distribution of corporate assets as a gift, their position is well taken. But it is equally well established that corporations are permitted to make substantial contributions which have the outward form of gifts where the activity being promoted by the so-called gift tends reasonably to promote the goodwill of the business of the contributing corporation. Courts recognize in such cases that al-

though there is no dollar and cent supporting consideration, yet there is often substantial indirect benefit accruing to the corporation which supports such action. So-called contributions by corporations to churches, schools, hospitals, and civic improvement funds, and the establishment of bonus and pension plans with the payment of large sums flowing therefrom have been upheld many times as reasonable business expenditures rather than being classified as charitable gifts. American Rolling Mill Co. v. Commissioner of Internal Revenue, 6 Cir., 41 F.2d 314; Heinz v. National Bank of Commerce, 8 Cir., 237 F. 942; Corning Glass Works v. Lucas, 59 App.D.C. 168, 37 F.2d 798, 68 A.L.R. 736; Forbes Lithograph Mfg. Co. v. White, D.C.Mass., 42 F.2d 287; American National Assurance Co. v. Ricketts, 230 Ky. 398, 19 S.W.2d 1071.

■ At the time when the plan was proposed and approved the financial condition of many of the associations was such that action of some kind was obviously necessary. The inability of many associations to perform their functions threatened to prevent a continuation in the district of the fundamental policy of the Federal land bank system. Other corrective measures over a period of years in the past had failed to remedy the situation. The bank and the associations were organized under the Act as interrelated Federal instrumentalities charged with the duty, under the supervision of the Farm Credit Administration, to administer a cooperative farm credit service. The bank was vested with all of the usual powers of the ordinary business corporation. An adequate farm credit service in the district of the bank could not be rendered without a major operation. Under such conditions the Farm Credit Administration was authorized to declare associations insolvent and appoint receivers or conservators therefor. 12 U.S.C.A. §§ 961 and 967. Such authority, however, is permissive rather than mandatory and is certainly not the exclusive method of dealing with the situation. Federal Land Bank v. Priddy, 295 U.S. 229, 234, 55 S.Ct. 705, 79 L.Ed. 1408. Liquidation of the impaired associations obviously presented many practical difficulties arising out of the nature of the capital stock and the contingent endorsement liability with respect to loans for long amortization periods. In any event, it would tend to destroy confidence in the land bank system. It is no doubt the

result of such practical difficulties that no association in the farm credit system has in the past been liquidated through a receivership proceeding. In view of such conditions it would seem that any plan proposed in good faith which was not in excess of the corporate power to carry it out and which had reasonable prospects of being for the ultimate benefit of all the associations in the district could not be successfully attacked by a few complaining stockholders who disagreed with the plan largely because of their failure to receive immediate tangible benefits therefrom. The plan proposed was adopted only after long and careful consideration of the interests of the bank and the associations and has been approved both by the Farm Credit Administration and by more than 80% of the associations themselves. It is only in exceptional cases that the Court will interfere with the discretionary internal management of corporations. Corbus v. Alaska Treadwell Gold Mining Co., 187 U.S. 455, 463, 23 S.Ct. 157, 47 L.Ed. 256; United Copper Securities Co. v. Amalgamated Copper Co., 244 U.S. 261, 263 through 264, 37 S.Ct. 509, 61 L.Ed. 1119; Consolidated Cement Corp. v. Pratt, 10 Cir., 47 F.2d 90, 93. "It is well established that the courts will not interfere with the discretion of a board of directors in exercising its legal powers by acting within the limits of its charter, and without fraud, actual or constructive, upon the stockholders, regardless of motives. Haldeman v. Haldeman, 176 Ky. 635, 197 S.W. 376." Carter v. Louisville Railway Co., 238 Ky. 42, 47, 36 S.W.2d 836, 838, Venus Oil Corp. v. Gardner, 244 Ky. 176, 50 S.W.2d 537.

The foregoing discussion has included very little consideration of the indirect benefits which will accrue to the bank. They are material. The crippled condition of the land bank system in this district will be eliminated and the associations will be enabled to again resume their normal functions, without which satisfactory operation of the land bank system has proved impossible. The operation may presently appear costly, but it has every prospect of being successful and ultimately even paying for itself. The estimated annual savings to the Bank of $308,650 will very probably absorb the entire cost in 8½ years. The reduction in the number of associations from 434 to 94 by consolidations gives reasonable assurance that the reorganized associations can operate successfully through the elimination of overlapping territory and of duplication of overhead costs, and by providing a much wider field for operations with more diversification of risk. This reduction of associations through consolidations could not be forced upon the associations without their consent, and their action in agreeing to such consolidations furnishes not only a real benefit to the land bank system but also legal consideration to support the bank's action, if such legal consideration was necessary. Woolum v. Sizemore, 267 Ky. 384, 102 S.W.2d 323. On the whole the proposed plan appears to be within the corporate powers of the bank and to involve a question which addresses itself directly to the judgment of its Board of Directors. Its decision in the matter, although not in accordance with the plaintiff's views, appears sufficiently supported by good business judgment as to place it well beyond the scope of judicial review.

Plaintiff's demand for the declaration of a dividend is apparently not pressed. In any event, it is well settled that the declaration of a dividend rests in the sound discretion of the board of directors. Unless they are guilty of bad faith or a wilful abuse of discretion, the court will not interfere. Such a situation is not shown by the record in this case. Bickel v. Henry Bickel Co., 184 Ky. 582, 584, 212 S.W. 602; Smith v. Southern Foundry Co., 166 Ky. 208, 213, 179 S.W. 205.

The complaint will be dismissed.