**GREENE COUNTY NAT. FARM LOAN ASS'N et al. v. FEDERAL LAND BANK OF LOUISVILLE et al.**

No. 10034.

Circuit Court of Appeals, Sixth Circuit.

Dec. 13, 1945.

216

F. H. Parvin and B. B. Fraker, both of Greeneville, Tenn., for appellants.

William C. Goodwyn, of Louisville, Ky., and W. Carroll Hunter, of Washington, D. C. (W. C. Goodwyn, of Louisville, Ky., John E. Lee, of Kansas City, Mo., W. Carroll Hunter, of Washington, D. C., David C. Walls, U. S. Atty., of Louisville, Ky., and Robert H. Shields, of Washington, D. C., on the brief), for appellees.

Before SIMONS, ALLEN, and MARTIN, Circuit Judges.

SIMONS, Circuit Judge.

The appellants seek review of a decree dismissing their complaint against the bank, the individual members of its Board of Directors and the Farm Credit Administration. The complaint sought to enjoin the bank from carrying out a plan approved by the Farm Credit Administration for the relief of National Farm Loan Associations in the Fourth Farm Credit District, the capital of which had become impaired, and for other purposes presently appearing. Originally four of the associations had joined in the action. Two of them have submitted to the decree, without appeal, the United States was permitted to intervene in support of the defendants below, and joins in their support of the District Court adjudication.

The Farm Credit Administration, the bank and the constituent Farm Loan Associations, owe their existence to and derive their powers from the Federal Farm Loan Act of July 17, 1916, as amended and now codified in 12 U.S.C.A. §§ 636 to 1012. Originally the banks and associations were under the supervision of the Federal Farm Loan Board within the Department of the Treasury. The functions of the Board were transferred to the Farm Credit Administration by Executive Order No. 6084, dated March 27, 1933, and later to the Department of Agriculture by Reorganization Plan No. 1, § 401, effective July 1, 1939, 12 U.S.C.A. preceding section 636.

Detailed analysis of the statutory scheme is impossible within the normal confines of an opinion. The Supreme Court has had occasion to consider certain aspects of the Act in respect to the organization and functions of federal land banks, and to declare that they are instrumentalities of the federal government engaged in the performance of an important governmental function. Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577; Federal Land Bank v. Gaines, 290 U.S. 247, 54 S.Ct. 168, 78 L.Ed. 298. It is necessary, however, to an understanding of the issues here presented, to consider the general structure of the Farm Credit Sys-

tem. The Act provides for the organization, by persons desiring to borrow money on farm mortgages, of corporations to be known as National Farm Loan Associations, with the charter of each association specifying the territory within which its operations are to be carried on. The Farm Credit Administration is vested with supervisory authority over the federal land banks and the loan associations, subject to the general control and direction of the Secretary of Agriculture. The banks and associations function cooperatively as interdependent operating units of a long-term farm mortgage loan service provided by the Act. On December 31, 1943, there were in existence in the twelve farm credit districts, each with a federal land bank, 3024 associations, including the 432 associations in the Fourth Farm Credit District in which the appellants function.

The mechanics provided for the carrying out of the purposes of the Act require that a prospective borrower make application to the association in his locality for membership therein. Before a loan is made by the bank it must be approved by the association and by a land bank appraiser appointed by the Farm Credit Administration. The association endorses all loans made through it by the bank and services them. The borrower is required to purchase stock in the association in the amount of $5 for each $100 or major fractional part thereof borrowed, and pledges this stock to the association as collateral security for the loan. The association, in turn, purchases a like amount of stock in the bank and pledges it as collateral security for its endorsement liability. The stock of the borrower and the association is required to be paid off at par and retired upon full payment of the loan by the borrower. Where, however, the association is indebted to the bank on its endorsement liability, the proceeds of the stock of such association are set off against the indebtedness. When the association does not receive the proceeds for the retirement of its stock because of such set-off, and is therefore unable to redeem the borrower's stock, it issues to the borrower a stock retirement certificate reciting that the stock has been cancelled and retired and that the certificate evidences the right of the recipient to share in the association's net assets on the basis of the number of his shares, but not to exceed their par value.

For many years the bank here involved absorbed losses incurred in connection with the loans made by it and endorsed by national farm associations, but in 1929 it discontinued this practice. The capital stock of many associations in the district beame impaired, and since an association with impaired capital could not accept applications for new loans, its income from fees of applicants was cut off. Many of the associations were thus disabled from exercising their functions in carrying out the purposes of the Act, and others were threatened with disability. This result was to a great extent attributable to the smallness of the association's territory, and so, to a volume of business too limited for a prudent distribution of risks. At the time involved in this action there was an existing indebtedness to the Federal Land Bank of Louisville from insolvent associations, of $1,480,286.41, after applying the proceeds of capital stock of former members of the association who had paid their mortgage loans in full without receiving proceeds from the cancellation of their stock.

The general policy of federal land banks during the first twelve years of their existence, was to pay small dividends annually, but in January, 1932, the Act was amended to provide that no dividend could be declared without the approval of the Farm Credit Administration, and no dividends were paid by the bank from 1932 through 1943. It was understood that general economic conditions would prevent approval of dividends by the supervisory authority.

On July 19, 1943, the directors of the bank approved a plan which provided for cancellation by the bank of the then existing indebtedness to it of insolvent associations, amounting to $1,480,286.41, and by which there was made available to such associations an additional sum of $1,004,875.-00, for the purpose of satisfying the claims of former members of such associations who held outstanding stock retirement certificates. The plan also provided for the establishment, by the bank, of reserves to the extent necessary to take care of estimated forseeable losses for which the associations might become liable. These reserves were also available to associations with capital not presently impaired, to the extent necessary to provide for foreseeable losses. It is to be observed that the cancellation of indebtedness, the furnishing of funds to liquidate claims of stockholders and the establishment of reserves, were not based on the amount of capital stock held by the associations, nor upon any provision

in the plan for credits or advances to associations with unimpaired capital. The bank estimated that the plan would result in savings to it of over $308,000 annually, and that such savings would absorb the cost of the plan over a period not to exceed 8½ years. The plan also provided for reduction, by consolidations, in the number of associations in the district from 434 to 94. Repayment by the associations of the funds advanced either by cash or credits, was not contemplated, and it is part of the plan that no association shall participate in either payments, credits or reserves against future losses unless it agrees to such consolidations as the bank shall propose.

At the time of the hearing below, land banks in many other districts had developed or were studying similar plans, and some of these had already been adopted and put into operation. For all of them, including the Louisville Bank, the plan adopted by the Houston Bank of Texas was the prototype, and other plans followed its general pattern. The Louisville Bank plan was to become operative as of December 1, 1943, if and when accepted by the stockholders of not less than 70% of the associations. The Farm Credit Administration formally approved the plan on July 31, 1943. Having been accepted by 71.52% of the associations by January 1, 1944, and an agreement having been entered into by the bank with each accepting association, the plan became effective. At the time of trial below it had been accepted by 80% of the associations owning 76% of the bank's stock, and the member borrowers of these associations represented 77% of all borrowers of the bank. At the time suit was started, the bank had already paid out to impaired associations the sum of $979,144.80.

Prior to trial the Farm Credit Administration asked for dismissal of the suit against it, on the ground that it is an unincorporated branch of the United States Government, and has no identity apart from the United States which has not consented to its being sued. The plaintiffs had alleged that the Farm Credit Administration is a body corporate, on the theory that since federal land banks are authorized by law to sue and be sued, 12 U.S.C.A. § 676, and are subject to the supervision and control of the Farm Credit Administration, authority to sue the latter should be implied in order to make a suit against a federal land bank effective. The court rejected this contention and dismissed the action as against the administration. The order of dismissal was here challenged in argument, but we find no discussion thereon in the briefs.

The authority of the bank to effectuate its plan is assailed by the appellants on a number of grounds. The bank, they say, is a corporation and as such has only such powers as are given to it by statute. It may not disburse corporate assets amounting to approximately $3,000,000, to ⅓ of its stockholders, to the exclusion of the other ⅔, except for an adequate tangible consideration. There is here no consideration, either tangible or intangible, to support cancellation of debts, cash payments to the associations, or an allocation of corporate funds to a reserve for future losses of a part of the corporate stockholders. They assert that the borrower members of the associations remain stockholders, notwithstanding surrender of stock and acceptance of retirement certificates, so that their interests in the assets of the associations are not association debts to be considered in determining association insolvency. They urge that the proposed consolidation of associations may be effected by strict compliance with the Act, without cancelling association debts or payments to the associations for redemption of retirement certificates, and finally, they say that any division of profits of the bank is a constructive dividend, and that other stockholders are therefore entitled to a like amount based upon their stock ownership.

The District Court considered it unnecessary to consider the contention that elements of the plan were not supported by adequate consideration, either tangible or intangible. It viewed the controversy not as an action upon contract either for its performance or for recovery of damages caused by its breach,—it considered the problem solely as one of corporate law involving complaint that corporate action was beyond the scope of authority conferred upon the corporation by the charter of its creation. With this view we agree, and no argument in the briefs of counsel gives it specific challenge. So considered, the court found ample authority for the principle that a private corporation has considerable latitude in cancelling debts, advancing money to rehabilitate distressed debtors, releasing statutory liens, entering into contracts of guaranty and in taking other protective action when, in the honest business judgment of its directors, such action will

be of ultimate benefit to the corporation, and there is no evidence of fraud or of self-interest on the part of its directors.

■ It is an elementary principle, even in private corporation law, that a court has no power to interfere with the internal affairs of a corporation in the absence of fraudulent conduct on the part of those who have been lawfully entrusted with the management and conduct of its affairs. Corbus v. Alaska Treadwell Gold Mining Co., 187 U.S. 455, 463, 23 S.Ct. 157, 47 L.Ed. 256; Consolidated Cement Corp. v. Pratt, 10 Cir., 47 F.2d 90; Atherton v. Anderson, 6 Cir., 86 F.2d 518 remanded 302 U.S. 643, 58 S.Ct. 53, 82 L.Ed. 500, modified on other grounds, 6 Cir., 99 F.2d 883. Of course, this principle is subject to refinements and exceptions based upon the specific facts of particular cases. It would serve no useful purpose, in view of reasoning presently to be developed, to cite and analyze the many decisions dealing with purely private corporations relied upon by the District Judge in support of his conclusions, 57 F.Supp. 783, by the appellees in defending and the appellants in assailing them, since we do not consider the present controversy to lie exclusively in the field of private corporation law. Even so, however, the court found that substantial benefits would inure to the corporation in the execution of the plan, though such benefits were not assayed under the law of contracts. What the appellants probably mean by their challenge to the consideration, is that the supposed advantages to the bank are unreal, that the plan is, therefore, not in the interest of the bank's stockholders nor the result of an exercise of a sound and informed business judgment. It is conceded, however, that a reorganization of the credit districts had become necessary. It is demonstrated that many of the associations in the district had become unable to perform their functions, that past corrective measures over a period of years had failed to remedy the situation, that an adequate farm credit service could not be performed by impaired associations, and that confidence in the successful functioning of the whole farm credit scheme was being destroyed. Liquidation of the impaired associations would present many practical difficulties arising out of the nature of their capital stock, their contingent endorsement liability and the shifting character of their borrower members. No association in the farm credit system has ever, in the past, been liquidated through a receivership proceeding, permissible under 12 U.S.C.A. § 961, and but few had ever been placed in the hands of conservators, as provided by § 967. It is not denied that, substantial as the expense of operation may be, it will pay for itself in a relatively short time. All of these considerations entered into the judgment of the court that the plan adopted by the bank was in the exercise of an honest and informed judgment and without fraud or self-aggrandizement on the part of its directors.

■ But, as indicated, the controversy does not lie, in its present aspect, in the field of private corporation law. The bank and the associations are instrumentalities of the federal government, engaged in the performance of an important governmental function. Federal Land Bank v. Priddy, 295 U.S. 229, 55 S.Ct. 705, 79 L.Ed. 1408. It is true that they have, by the statute of their creation, been invested with some of the characteristics of private business corporations, but in the beginning it was contemplated that their stock would be wholly or chiefly government owned. The Federal Farm Loan Act had for its purpose, "to provide capital for agricultural development, to create standard forms of investment based upon farm mortgages, to equalize rates of interest upon farm loans" etc. 39 U.S.Stat. 360. The Act sought to assure a sound, stable and standardized agricultural credit economy through prescribing the eligibility of farmers for loans, the purpose for which money lent may be used by the farmer, the character of the security for the loan, minimum and maximum loan amounts, and a maximum rate of interest. 12 U.S.C.A. §§ 761, 771, 773, 781, 791. The profit-making motive is subordinated to the rendition of an effective long-term mortgage credit service to farmers at the lowest possible cost. 1st Ann.Rep. of Federal Farm Loan Board, H. Doc. 714, 65th Cong. 2nd Sess., p. 13.

■ The bank's funds for making loans are derived originally from proceeds of the sale of its capital stock, and thereafter through the sale of farm loan bonds. But the stockholders of the bank are not investors, as that term is usually understood. The borrower members of the associations are stockholders by compulsion rather than by choice, for they may not become borrowers without at the same time becoming stockholders. So, too, with the associations. They become stockholders only by reason of the function assigned to

them of securing, approving and guaranteeing loans. The bonds of the banks are exempted from state as well as federal taxation. Smith v. Kansas City Title Co., supra. The bank's directors are not elected by its stockholders, three being appointed by the Farm Credit Administration, a fourth from nominees of the associations, and of the remaining three only one is nominated and elected by the farm loan associations. The entire system is an integrated cooperative organization for the purpose of assuring farmers opportunity to borrow money upon long-term mortgages, at minimum interest rates, under the direction, supervision and with the aid of the government. That is the dominant purpose of the Act creating the associations and the bank, in the light of which the scope of the bank's authority must be determined.

■ It would seem to be clear that the authority of the bank to effectuate the public purpose of the Act must be liberally viewed, and restrictions on power not lightly asserted without clear mandate of the statute therein expressed or clearly implied. As was said in Anderson v. Abbott, 321 U. S. 349, 367, 64 S.Ct. 531, 540, 88 L.Ed. 793, "Once the purpose or effect of the scheme is clear, once the legislative policy is plain, we would indeed forsake a great tradition to say we were helpless to fashion the instruments for appropriate relief," and this was said after noting the distinction between "judicial interference to cripple or defeat a legislative policy" and judicial interference with the plans of those who would circumvent that policy, the first being by implication condemned, and the other approved. What we are now asked to do is to interfere with the functioning of a governmental agency engaged in implementing a clearly defined public policy to make available not to some farmers, but to all in a credit district, a long-term, low-interest credit service which only solvent farm associations can provide, and to restrain, by the extraordinary power of equity, the execution of a plan which follows more or less closely a national pattern, nowhere, so far as we are advised, subjected to judicial interference. This may not be done without clear and specific statutory mandate.

■ But above and beyond all this, supervision over the business of the bank has been specifically entrusted to the Farm Credit Administration, itself an agency of the United States, and not to the courts. By 12 U.S.C.A. § 831(i) and (j) the Farm Credit Administration is specifically authorized to exercise a general supervisory authority over federal land banks, and given such incidental powers as shall be necessary or requisite to fulfill its duties and to carry out the provisions of the Act. Moreover, the Farm Credit Administration is under the supervision of the Secretary of Agriculture and is required to make annual reports to the Congress. What has been said concerning the doctrine that the judiciary will not interfere with the exercise by a private corporation or a public agency of discretionary functions, applies with greater force to interference with the discretionary functions of a supervisory governmental agency, exercised upon a higher level. This is not to say that there may be no judicial checks to arbitrary and capricious action on the part of the bank, to proceedings in violation of law or tainted with fraud, but there may be no interference with discretion honestly exercised by governmental agencies acting within the field of discretion conferred upon them by the Congress. At the very least, the courts will accord great weight to the construction by a public agency of its powers under a statute which requires extensive administrative implementation. Dobson v. Com'r, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248; United States v. Citizens Loan & Trust Co., 316 U.S. 209, 62 S.Ct. 1026, 86 L.Ed. 1387.

■ Coming to these conclusions it would seem to be unnecessary to adjudicate subordinate contentions urged upon us by the appellants. That the land banks are competitors of conventional lending agencies so that their good will is important to preserve, would seem to be obvious from the fact that the Congress, by creating land banks with a competitive advantage over such agencies, sought to free farmers from the necessity of paying high interest rates on short-term mortgage loans, and by the same token, the effort of the appellee bank to restore the integrity of the farm credit system in its district, is necessarily in furtherance of a need for continued safeguarding farmer borrowers who, through loss of confidence in the federal farm credit system, may be diverted in their search for loans back into ordinary commercial channels. The obligation of the farm loan associations, upon redemption certificates, is clearly a debt which must be considered in determining their solvency. This requires no rationalizing. We agree with the District Judge that the statutory provisions for

receiverships and conservators for impaired associations is permissive and not mandatory, and that the allocation of funds in conformity with the plan for the purposes indicated, being an expedient for carrying out the broad public purposes of the statute, is not distribution of a dividend, either actual or constructive. Finally, being of the opinion that the appellants may not prevail against either the bank or its directors, we see no occasion for considering or deciding the interesting problem submitted in argument as to whether the Farm Credit Association was rightly dismissed from the action.

The decree is affirmed.