OPINION Issue 1. Whether $1¡02,521¡..71 Received in the Year 1958 is Gross Income to Petitioner or is it Money Received in Exchcmge for Stock of Petitioner TJnder Section 1082 The first issue to be considered is whether petitioner must include in gross income for 1958 the $402,524.71 received from preferred shareholders and their assignees. Section 1032 of the Internal Bevenue Code of 1954 provides that no gain or loss shall be recognized to a corporation on the receipt of money or other property in exchange for stock (including treasury stock) of such corporation. Section 1032 had no counterpart under the 1939 Code. Congress enacted section 1032 to remove uncertainties regarding the taxation of dispositions by a corporation of its own stock. H. Bept. No. 1337, to accompany H.B. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 268 (1954). The key words of section 1032 so far as this case is concerned are “in exchange for stock * * * of such corporation.” If the contract-holders owned the 71,001 shares of common stock at the time of its public distribution by Buckley Enterprises, then Cardinal did not receive the $402,524.17 directly in payment for the issuance of the 71,001 shares of common stock. Conversely, if the contract-holders did not validly own the 71,001 shares of common stock at the time of its public distribution by Buckley Enterprises, then Cardinal did receive the $402,524.17 directly in payment for the issuance of the 71,001 shares of common stock. On or about December 4, 1958, the contract-holders agreed to pay Cardinal the amount of their profits on the sale of the contract stock. They acted pursuant to the opinions of Wolford and Thurman, who had concluded that the common shares were sold for and on behalf of petitioner. The entire sales proceeds, less broker’s commissions to Buckley Enterprises, belonged to petitioner. Belying on the advice of Wol-ford, Thurman advanced two theories in support of his opinion.[3] One theory was that the common shares represented authorized but unissued stock. Under sections 304.123 and 304.132 of the Kentucky Revised Statutes an insurance company could not have authorized an unissued stock.[4] The second theory looked to the fact that 12 of the 13 contract-holders were directors of Cardinal. Thus, the contract-holders were in the position of fiduciaries. As such, they could not profit to the detriment of the corporation. By retaining their profit of $402,524.71, the contract-holders precluded Cardinal from using these funds as reserves to protect the policyholders. Accordingly, their contracts to purchase the common stock should be ignored. The contract-holders should be treated as only agents for Cardinal. The full sales proceeds, less broker’s commissions, belonged to Cardinal. We have examined Kentucky law and have concluded that the second theory is correct. It is the law of Kentucky that directors and dominant or controlling shareholders, or groups of stockholders, are fiduciaries, Zahn v. Transamerica Corporation, 162 F.2d 36 (C.A. 3, 1947); Pepper v. Litton, 308 U.S. 295 (1939), and that such fiduciaries have an inherent obligation not to use their position to advance their own interest. Zahn v. Transamerica Corporation, supra; Central West Casualty Co. v. Stewart, 248 Ky. 137, 58 S.W. 2d 366 (1933); Graham v. Tom Moore Distillery Co., 42 F.Supp. 853 (W.D. Ky. 1941). The law in Kentucky in this regard is very well stated by the Court in the Zahn case as follows: The law of Kentucky also demonstrates the fact that those in charge of a corporation stand in a fiduciary relation to its minority stockholders. In Graham v. Tom Moore Distillery Co., D.C. W.D. Ky., 42 F.Supp. 853, 855, 856, the District Court issued an injunction against the carrying out of a contract peculiarly advantageous to a majority holder of the corporation’s stock but not to the corporation. Judge Miller, quoting from Venus Oil Corporation v. Gardner,8 244 Ky. 176, 50 S.W. 2d 537, 538, went on to state “that it is * * * well settled by many Kentucky decisions that a person occupying a fiduciary or confidential relationship can not lawfully acquire any private interest of his own in opposition to his position of trust, and that transactions between fiduciaries and cestuis que trust are constructively fraudulent.” Citing Hoge v. Kentucky River Coal Corp., 216 Ky. 51, 287 S.W. 226; Walker v. Carter, 208 Ky. 197, 270 S.W. 770; Clay v. Thomas, 191 Ky. 685, 231 S.W. 512; Louisville Point Lumber Co. v. Thompson, 202 Ky. 263, 259 S.W. 345. He also said, 42 F.Supp., at page 856, that a contract entered into by such parties as were there involved, viz., between the corporation itself and the majority stockholder, is “either constructively fraudulent or absolutely void regardless of whether or not actual fraud can be spelled out of the express provisions of the contract.” Judge Miller is a judge of long experience in the interpretation of Kentucky law. See Huddleston v. Dwyer, 322 U.S. 232, 237, 64 S. Ct. 1015, 88 L. Ed. 1246. Other Kentucky decisions hold that public policy forbids an agent to act for his principal in a matter involving the agent’s private interest and that such a contract is void as between principal and agent. See Central West Casualty Co. v. Stewart, 248 Ky. 137, 58 S.W. 2d 366; Weatherholt v. National Liberty Ins. Co., 204 Ky. 824, 265 S.W. 311; King Const. Co. v. Mary Helen Coal Corporation, 194 Ky. 435, 239 S.W. 799, and F.T. Gunther Grocery Co. v. Hazel, supra. In the Weatherholt case, 204 Ky. at page 826, 265 S.W. at page 312, the Court of Appeals of Kentucky quoted, “ ‘The law has too much regard for the infirmity of human nature to allow a person to be subjected to the temptation of acting as an agent in a matter in which he has an interest adverse to his principal. The law, dealing with the average integrity and disinterestedness, wisely assumes that no man can faithfully serve two masters whose interests are in conflict.’ ” [Footnote omitted. 162 F.2d at 43.] In view of the Zahn decision, and cases cited therein, we conclude that the contracts between the preferred shareholders and Cardinal were invalid. Cardinal should be treated as having received the $402,-524.71 directly in payment for the issuance of the 71,001 shares of common stock. The requirements of section 1032 are accordingly met and no gain is recognized by Cardinal upon receipt of the $402,524.71. Since we have concluded that Thurman’s second theory was correct, we do not pass on the correctness of Thurman’s other theory. Respondent urges that our holding in General American Investors Co., 19 T.C. 581 (1952), affd. 211 F.2d 522 (C.A. 2, 1954), affd. 348 U.S. 434 (1955), controls the case at bar. In the General American case, two shareholders of the corporation, one of whom was a director, acquired warrants in June 1944 to purchase a certain number of shares of the corporation’s common stock. Between June 1945 and June 1946 the shareholders, individually and through a partnership, sold their shares. These shareholders received a total consideration of $765,-620.75. In December 1945 they exercised their warrants at a total cost of $555,165.47. Their net profit was $210,455.28. Pursuant to the provisions of section 30(f) of the Investment Company Act of 1940 and section 16 (b) of the Securities Exchange Act of 1934, the shareholders were required to pay into the corporation their profits on the above transactions. The corporation credited the amounts received to its capital surplus account. This Court held that the entire sum, less attorneys’ fees, was taxable income to the corporation. General American Investors Co., supra. The instant case is distinguishable from the General American case. In the latter case we held that the amounts paid into the corporation were not payments of part of the purchase price of the stock. We stated there that “We do not think that the facts which have been stipulated sustain petitioner” in its contention that “the amounts paid in constituted additional payments on the original issuance price of the stock.” To the contrary, in the instant case we conclude that the contract-holders never validly owned their shares of common stock under Kentucky law. Accordingly, Cardinal should be treated as having received the $402,524.71 directly in payment for the issuance of the 71,001 shares of common stock. Since General American Investors Co. is distinguishable from the case at bar, we need not reach the question whether the enactment of section 1032 with the 1954 Code has changed the result of that case. Issue #. Deductibility of Attorney’s Fees Respondent has denied petitioner a deduction[5] of $17,264.75 in the taxable year 1958 for legal fees paid to the law firm of Gambrell, Harlan, Russell, Moye & Richardson. Respondent concedes that petitioner paid the legal fees in 1958. Respondent has disallowed the deduction on the grounds that the services were performed for the contract-holders rather than petitioner. We conclude that petitioner should be allowed a deduction for payment of the $17,264.75. The law firm partly rendered its services in connection with Federal and State investigations as to sales of the contract stock. These investigations directly affected Cardinal since they eventually resulted in the replenishment of Cardinal’s reserves. The legal services also related to a possible merger between Cardinal and another company as well as various other corporate matters. Issue §. Deductibility of Acturial Fees This issue is similar to the preceding one in that the governing sections of the 1954 Code are 809(d) (12) and 162(a). The Kentucky commissioner of banking, upon receiving authorization to employ outside assistance, retained J. Huell Briscoe & Associates to investigate the registration and sale of Cardinal’s common stock. The commissioner was authorized at that time to employ outside assistance in such an investigation. State law provides that the cost of an examination will be at the expense of the one examined. Ky. Rev. Stat. sec. 292.170 (1953).[6] Cardinal claimed a deduction of $5,909.73 on its 1958 Federal income tax return for payment of actuarial fees to J. Huell Briscoe & Associates. As in the previous issue, respondent concedes that petitioner paid this expense. Respondent seeks to disallow the deduction on the grounds that the report prepared by Briscoe deals primarily with the activity of the contract-holders and proves that their activities were the cause of the audit. Thus, the actuarial fees were not an ordinary and necessary expense of petitioner since they were an expenditure made on behalf of the contract-holders. We hold that the services were performed for the commissioner of banking and not expressly for either the petitioner or the contract-holders. Petitioner had a statutory obligation to make these payments. The fees were an ordinary and necessary expense of petitioner. Issue I. Amownt of Operating Loss Deduction for Taxable Year Ended November 10, 1959 The Commissioner disallowed an operating loss deduction in the amount of $448,914.88 for the taxable year ended November 10, 1959. Commissioner’s disallowance was based upon adjustments to petitioner’s gross income for the taxable year 1958. Accordingly, our resolution of issues 1,2, and 8 will resolve this issue. Decision will be entered under Rule 50. Compare Joseph P. Pike, 44 T.C. 787 (1965), which relates to the same series of transactions confronting the Court in the case at bar. We held, inter alia, that Pike, a contract-holder, was not entitled to relief under sec. 1341 on account of payment to Cardinal of his share of the profits on the public distribution of the common shares. We held that Pike had not shown that it was “established” that he “did not hare an unrestricted right to” the amount so paid. We emphasized, at page 800: “Pinally, the record does not disclose the theory upon which Thurman and Wolford were basing their claim that the profits belonged to Cardinal; so we cannot say whether, under Kentucky law, such claim would have been upheld.” In the case at bar, Thurman and Wolford have fully disclosed their theories. 304.132 Increase or decrease of capital stock. The insurer may increase or decrease its capital stock in the manner provided for corporations generally * * * but no such change shall be effective until: * * * * * * * (2) The full amount of increase has been either (a) subscribed and paid in in cash or assets as required for the original capitalization, or (b) as represented by a capitalization of available surplus. [Ky. Rev. Stat. (1953). This provision was repealed effective June 16, 1960.] The disallowance is under see. 809(d) (12). This section, subject to certain modifications not here pertinent, allows life insurance companies all deductions allowed under subtit. A. Deduction therefore must he allowable as an ordinary and necessary expense under sec. 162(a). Repealed effective Jan. 1, 196(1.